# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
Heard in Memphis
November 9, 2004 Session

## STATE OF TENNESSEE v. DETRICK COLE

**Direct Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**

**No. 01-01221     Joseph B. Dailey, Judge**

---

**No. W2002-01254-SC-DDT-DD - Filed January 20, 2005**

---

The defendant, Detrick Cole, was convicted of first degree premeditated murder.  The jury imposed a sentence of death upon finding that the prosecution had proven beyond a reasonable doubt that the defendant had been previously convicted of "one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person,"[1]and that this aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt.  The defendant appealed, challenging his conviction and sentence.  The Court of Criminal Appeals affirmed.  The case was docketed in this Court.  Tenn. Code Ann. § 39-13-206(a)(1).  After considering the briefs and the record, this Court entered an order requesting that the parties address at oral argument the following four issues:  (1) whether the evidence is sufficient to support the conviction; (2) whether the defendant was deprived of his constitutional right to a fair trial when the trial court required the defendant to submit to fingerprinting in the presence of the jury; (3) whether, under Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002), the jury rather than the judge must determine whether the statutory elements of prior convictions used to support the (i)(2) aggravating circumstance involve the use of violence to the person; and (4) whether the factors for mandatory review in Tennessee Code Annotated section 39-13-206 (c)(1) require reversal of the sentence of death.  After carefully and thoroughly considering the issues in light of the record and the relevant authority, we affirm the defendant's conviction and sentence.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

FRANK F. DROWOTA III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.  ADOLPHO A. BIRCH, JR., filed a separate concurring-dissenting opinion.

---

[1]Tennessee Code Annotated section 39-13-204(i)(2) (1999), hereinafter referred to as "(i)(2) aggravating circumstance" or "(i)(2) aggravator."

Robert Wilson Jones, District Public Defender; Tony N. Brayton and Garland Erguden, Assistant Public Defenders, for the appellant, Detrick Cole.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; Stephen P. Jones and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. BACKGROUND

### A. Guilt Phase

The proof offered by the prosecution at trial established that, around 2 a.m. on October 17, 2000, the twenty-year-old defendant, Detrick Cole, killed the victim, twenty-seven-year-old Santeife Thomas, by shooting him twice in the head. The evidence established that Thomas had returned home from work around 12:30 a.m. on October 17 and left shortly afterward in his late-model Mitsubishi Galant to visit a friend. Thomas was next seen at the Ridgemont Apartments in North Memphis, where he agreed to drive a person identified as "Little E" to the Raleigh Woods Apartments. The defendant and fourteen-year-old Andropolis Wells accompanied the victim and "Little E." Wells, testifying for the prosecution, related that after Thomas dropped off "Little E" at the Raleigh Woods Apartments, the defendant asked Thomas to drive him to the Garden Walk Apartments. The defendant directed Thomas to the back of the apartments and asked Thomas to park the car near an area overgrown with grass and weeds. After Thomas parked, all three men exited the car. Thomas and Wells waited near the car while the defendant left to get crack cocaine from "Jerry."[2] The defendant returned a short time later and said "Jerry" would bring them some drugs.

Wells waited at the car, but the defendant and Thomas walked into the overgrown area. Wells heard the defendant repeatedly telling Thomas to open his mouth and saw the defendant pointing a gun at Thomas's face. Thomas, who had no weapon and made no aggressive move toward the defendant, backed away and repeatedly told the defendant to "stop playing." Wells then heard two gunshots. The defendant ran from the bushes with a set of keys, but, apparently realizing that he had the wrong keys, the defendant went back into the overgrown area and returned with another set of keys. The defendant, who had blood on his hand, told Wells to get into the car. Shocked by the shooting and fearing for his own life, Wells accompanied the defendant in the victim's car back to the Ridgemont Apartments. There, the defendant removed two shells from the murder weapon, rubbed them with his shirt, and threw them into a garbage can. The defendant and Wells then went to an upstairs apartment and left the gun with a person known to Wells as "Jewel."

---

[2]According to Wells, the defendant said he was going to get "some yams" from Jerry. Wells explained that "yams" is the street name for crack cocaine.

When the defendant and Wells returned to the victim's car, the defendant discovered that he had lost his electronic organizer during the killing and expressed fear that its discovery would lead to his apprehension. Thus, the defendant and Wells drove the victim's car back to the apartment complex to search for the organizer and parked in a driveway near the murder scene. They searched for a short time; the defendant rolled the victim's body over, but he did not find the organizer. When they returned to the victim's car to leave, they noticed a man standing outside across the street looking at them. At the defendant's instruction, Wells spoke briefly to the man before he and the defendant left.

Wells remained with the defendant for two days after the murder. Before the defendant dropped off Wells at Wells's home, the defendant told Wells that he had shot Thomas with a .44 caliber handgun because Thomas owed him fifteen dollars. Wells remarked, "Fifteen dollars? Man I could have gave you fifteen dollars." The defendant replied, "N----r gonna start respecting me."

Wells's testimony was corroborated by the testimony of Marcus Puryear, who lived near the crime scene. At approximately 2 to 2:30 a.m. Puryear had been sitting in his car, talking on a ham radio when he heard "two loud gunshots – blasts." He saw a car speeding away from the direction of the gunshots, and from the sound of the car, Puryear identified the vehicle as having a small, four-cylinder engine. Later, while looking out the window of his home, Puryear saw a car pull into a driveway immediately across from his residence. Two African-American males left the car and walked around into the area overgrown with weeds, near where the gunshots had sounded. After three or four minutes, the men returned to the car. By this time, Puryear was standing outside looking in their direction. One of the men walked over and asked if Puryear knew a person named Carlos or Michael who lived across the street. When Puryear answered that he had never heard of anyone by that name living there, the two men left. Puryear had not seen these men before and decided to write down the tag number, color, make, and model of the car they were driving. Puryear provided this information to the officers who discovered Thomas's body and investigated his murder. The description and tag number Puryear provided matched the description and tag number of the victim's vehicle.

On October 18, 2000, Robert Eric Adams, a resident of the Ridgemont Apartments, saw the defendant sitting on the steps to Adams's apartment. Because the defendant was looking "down," Adams asked him what was wrong. The defendant said that he and his girlfriend had fought. During this conversation, the defendant stunned Adams by telling Adams that he had killed Thomas. The defendant said that Thomas had been taking him somewhere to get marijuana when the defendant asked Thomas about money Thomas owed him. Thomas promised to pay the defendant on Friday. After they arrived at their destination and left the car, the defendant continued to ask Thomas about the debt. Thomas again said that he would pay the defendant on Friday and offered to include an additional one hundred dollars for the delay. Believing that Thomas was lying, the defendant took out a pistol and shot Thomas in the head and a second time in the face to assure that Thomas was dead. The defendant told Adams that he had hidden Thomas's car. At the defendant's request, Adams drove the defendant to the Garden Walk Apartments, where the defendant pointed to Thomas's body and said that he had dropped his "Rolodex" and was trying to find it. Searching the grass near the body, the defendant found his organizer. The two men then returned to the Ridgemont Apartments. Adams testified that later that afternoon, Thomas's mother came to the

apartments and asked if anyone had seen her son. The defendant told her that Thomas might be "hanging out" or "partying." At some point thereafter, Adams told an acquaintance, Carlos Williams, that the defendant had killed Thomas, but Adams did not tell Williams the location of Thomas's body.

On the evening of October 19, 2000, in an action unconnected with this case, the police conducted a raid at the Ridgemont Apartments and arrested Carlos Williams for unlawful possession of a weapon. Williams, who apparently knew that Thomas's mother had filed a missing persons report, told the police what Adams had told him about the defendant killing Thomas. On October 20, the police questioned Adams, who told them what the defendant had said about the murder, except the location of Thomas's body.

Thereafter, the police arrested the defendant as he was leaving a convenience store. At the time of his arrest, the defendant had a Mitsubishi ignition key on his person. Arresting officers were unaware of the significance of the key and allowed the defendant to retain it. By the time investigators first spoke with the defendant at police headquarters, the key had disappeared. Officers later found it hidden under the cushion of the chair in which the defendant had been sitting. The defendant explained that he collected keys and had found the key at the Ridgemont Apartments. He denied knowing anything about Thomas's disappearance and claimed that he had hidden the key after having "second thoughts" about it. The police released the defendant because at that time they had not found the victim's body and were not certain a homicide actually had occurred.

On October 21, the police discovered Thomas's body in a grassy, overgrown area in the Garden Walk Apartment complex. The victim had no wallet, identification, keys, money or contraband on his body. On October 22, Thomas's automobile, which a patrol officer previously had noticed abandoned on a dead end street in North Memphis, was towed to police headquarters. The vehicle's license plates had been removed, and its VIN numbered covered. Blood was discovered on the handle of the driver's door. The ignition key police officers had seized from the defendant fit the victim's car. The defendant's fingerprint was found on a piece of paper inside the car.

After obtaining additional information from Wells, the police resumed searching for the defendant. On October 23 the defendant called the police and set up a time to surrender, but he failed to show up at the agreed time. Finally, on October 25, eight days after the murder, patrol officers arrested the defendant, who gave a statement.[3] Although the defendant admitted he had

_____

[3]After signing a waiver of his rights, the defendant gave the following statement:
> On the night that Teifus [Thomas] was murdered, it was me, Drop [Wells], and Teifus. We left the Ridgemont Terrace Apartments going to Garden Walk where Teifus told me that he had some money – some of the money that he owed me. And when we got there, he stalled – he stalled like telling me that he was waiting on the money but never did get it.
>
> He told me that he gave me his key to his car as partial payment until he'd give me the money, but when I turned down the key, we got into an argument, and he went on about he wasn't going to pay me, and I asked him why, but he never did

-4-

killed Thomas, the defendant claimed that he had shot Thomas because Thomas had charged him and threatened to hurt him. The defendant said that Thomas had been four or five feet away when shot. The defendant also claimed that he had needed the money Thomas owed him to support himself and his pregnant girlfriend. Although the defendant told the police that the gun they had taken from Carlos Williams was the gun he had used to shoot Thomas, tests revealed that it was not. The murder weapon was never found.

Dr. Craig Thomas Mallak, the forensic pathologist who had performed the autopsy on the victim's body, and Dr. Steven A. Symes, a forensic anthropologist who had reconstructed and examined the victim's skull, testified for the prosecution. Dr. Mallak explained that the victim had been shot twice in the head. According to Dr. Mallak and Dr. Symes, the victim was shot first above his left eye and next behind his left ear. Based on the damage to the victim's skull and brain, Dr. Mallak testified that both wounds could have been contact wounds, inflicted from extremely close range. Dr. Mallak opined that the wound behind the victim's ear definitely had been a contact wound, inflicted when the gun was less than one inch from the victim's head. Although Dr. Mallak was unable to determine conclusively whether the first wound also had been a contact wound, he opined that either wound would have been sufficient to cause the victim's death and to incapacitate the victim immediately. Dr. Mallak testified that the gunshots caused "complete destruction of the skull." Both Dr. Mallak and Dr. Symes opined that the wounds were consistent with injuries typical of a large caliber weapon such as a .44 caliber handgun.

The defendant presented no proof at the guilt phase of the trial. The jury found the defendant guilty of premeditated first degree murder.

---

say. So he came in my face with threats that he wasn't going to pay me, and I could take it how I wanted to take it, and I asked him why he wasn't going to pay me, so that's when he went to putting his hands in my face and pushing me. And then we started into a small argument of words back and forth. And that's when he tried to attack me. I went into my pocket and pulled out a .38, and Teifus rushed at me, and I shot him.

After I shot him, I looked at his body and threw up. I still had his key in my left hand, and I got in his car, and I left the crime scene with Drop, and we went and parked the car, and we got out of the Ridgemont Terrace Apartments.

I went back to the body because I dropped my organizer, and I went to get it. And when I got it, I left and took his car and parked it again on Voltaire Street.

The reason why I murdered Teifus really wasn't about the money. He charged at me as if he was trying to attack me and hurt me. Instead of me defending myself with my fist, I pulled the gun out, and I used it on him. I didn't have any place to stay. My girlfriend is pregnant, and we don't have any help, and I needed my money that he owed me. I just wanted to take care of my family and try to find a place for us to stay when the baby was born.

**B. Sentencing Phase**

At the sentencing phase of the trial, the Shelby County Criminal Court Clerk testified that the defendant had pleaded guilty in February 1997 to robbery, kidnapping, reckless endangerment, and attempted rape and had received an effective sentence of three years confinement in the Shelby County workhouse. The defendant committed these offenses at age fifteen. In order to prove these four prior convictions, a fingerprint technician with the Shelby County Sheriff's Department obtained the defendant's right thumb print in the presence of the jury, compared this print with the print associated with the booking number for the four prior convictions, and then testified that the defendant's thumb print matched the print associated with the booking number for the four prior convictions.

All of the defendant's prior convictions stemmed from a single criminal episode that occurred in 1995. Darrell Webster, the victim of the defendant's prior criminal activity, testified for the prosecution. Webster recalled that during the early morning hours of November 18, 1995, as he was leaving an adult bookstore, the defendant and another man accosted him at gunpoint and ordered him to get into the victim's car. After pleading with the two men, Webster thought he had convinced them not to harm him; however, eventually Webster came to believe the two men intended to kill him. The defendant held a gun on Webster as the men drove around Memphis. The defendant remarked to Webster, who was crying, "Do you want to go out like a punk? Go out like a man." After spinning the barrel of the gun, the defendant placed the weapon against the back of Webster's head and pulled the trigger. The gun did not fire. Next, the defendant placed the barrel of the gun against Webster's head, directly behind Webster's ear, and again pulled the trigger. Again the gun did not fire. Webster recalled the defendant describing his actions as "Russian Roulette." Next, after accusing Webster of being a homosexual, the defendant forced Webster to climb into the back seat and to perform oral sex on the defendant. Thereafter, the defendant and his accomplice discussed how to kill Webster and where to dump his body. By promising to rent a car for the two men, Webster finally convinced the defendant's accomplice to drive to the Memphis airport. When the vehicle slowed to get a ticket for parking, Webster escaped and ran to a nearby airport security officer, who arrested the defendant and his accomplice, thus ending Webster's five-hour ordeal.

The final witness for the State was victim-impact witness Marcie Turcios, the victim's half-sister. Turcios testified that the victim had been a very special, generous, giving person who helped others every way he could. She explained that his death had seriously affected both her and her brother's mother. Turcios explained that Thomas's death had left a void in her life, that she had missed work because she could not sleep, and that she regretted that her seven-year-old son would never have an opportunity to know his uncle.

The defendant's father and mother testified in mitigation for the defense. The family had moved to Memphis from Ashland, Mississippi, about thirteen years earlier. In the ensuing thirteen-year period, the family had bought and sold five houses before returning to Olive Branch, Mississippi. The defendant's grades began falling after the family came to Memphis. The defendant's father had worked twelve to thirteen hours per day as the finance director for an automobile dealership. The defendant's parents had been married for twenty-five years and described themselves as Christian people. The second of three children, the defendant had regularly

attended church with his family until he left home in 1996 because he refused to follow family rules. The defendant was fifteen years old when he committed the offenses against Darrell Webster. The defendant's parents confirmed that the defendant loved his fourteen-month-old daughter, whom they were raising. The defendant's mother and father pleaded with the jury to spare their son's life and expressed sorrow for the victim's death. The defendant's father assured the jury that the defendant was very sorry for what had happened.

The defendant testified in his own behalf. Although he acknowledged killing the victim by shooting him twice in the head, the defendant commented that "half of the things" the State's witnesses had said about the crime were lies. The defendant expressed his remorse, maintained that he did not mean to do what he had done, acknowledged that he had done wrong and that he, not the victim, had been the "bad person," pleaded for mercy, and asked the jury not to kill him.

Upon finding that the prosecution had proven the (i)(2) aggravating circumstance beyond a reasonable doubt and that this aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death. The defendant appealed, challenging his conviction and sentence. The Court of Criminal Appeals affirmed, and the case was docketed in this Court. We affirm.

## II.  SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the convicting evidence. Although conceding that the record contains some evidence to support a finding of premeditation, the defendant argues that the evidence is insufficient for a rational trier of fact to find premeditation beyond a reasonable doubt.

The defendant was convicted of first degree premeditated murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1998). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.  Tennessee courts have identified several circumstances that may be considered indicative of premeditation, including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing.  State v. Holton, 126 S.W.3d 845, 859 (Tenn. 2004); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The proper inquiry for an appellate court reviewing a sufficiency challenge is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt. On appeal, the defendant has the burden of illustrating why the evidence is not sufficient to support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn from the trial evidence. Carruthers, 35 S.W.3d at 557-58; Hall, 8 S.W.3d at 599. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence. Id. Nor may this Court substitute inferences it draws from circumstantial evidence for those drawn by the trier of fact. See Carruthers, 35 S.W.3d at 557-58; Liakas v. State, 286 S.W.2d 856, 859 (1956). The standard of appellate review is the same regardless of whether the conviction is based upon direct or circumstantial evidence. Holton, 126 S.W.3d at 858.

Considering the proof in this record in accordance with these familiar standards, we hold that the evidence clearly is sufficient to support the jury's verdict. The proof offered at trial shows that the defendant directed the victim to drive him to an overgrown area behind an apartment complex to obtain drugs. The defendant became upset because the victim was unable to pay immediately a fifteen-dollar debt that the victim owed the defendant. The defendant pointed the gun at the victim, told the victim to open his mouth and then shot the victim first above the victim's left eye and then again behind the victim's left ear. By his own admission, the defendant shot the victim a second time, with the gun within one inch of the victim's head, to ensure the victim's death. The defendant's statements after the crime indicate that he thought about shooting the victim before doing so. The defendant told Wells, Adams, and the police that he had committed the murder because the victim owed him money that he needed to support his pregnant girlfriend and because the victim had disrespected him. These statements support the jury's finding of premeditation. Furthermore, the defendant's actions before and after the murder support the jury's verdict. The defendant directed the victim to the secluded, overgrown area where the crime occurred. Immediately after the murder, the defendant wiped clean the shells from the murder weapon and discarded them. The defendant likewise quickly disposed of the murder weapon, returning the gun to "Jewel" shortly after the crime occurred. The defendant also returned to the scene of the crime twice to recover an electronic organizer, which he feared would lead to his apprehension if not recovered. Simply stated, the record contains sufficient – indeed overwhelming – evidence to support the jury's verdict finding the defendant guilty of premeditated first degree murder. This issue is without merit.

### III.  FINGERPRINTING IN THE JURY'S PRESENCE

The defendant argues that the trial court violated his Fourteenth Amendment right to a fundamentally fair trial by allowing the prosecution to fingerprint him in the jury's presence. Citing Estelle v. Williams, 425 U.S. 501 (1976) and State v. Braden, 874 S.W.2d 624, 626 (Tenn. Crim.

App. 1993), the defendant asserts that "[c]ourts must be alert to practices which undermine the presumption of innocence of the accused and such practices must be subjected to 'close judicial scrutiny.'" The defendant contends that, by taking his thumb print in the jury's presence, the prosecution treated him "like a criminal[,] subjecting him to a humiliating and embarrassing procedure." We disagree.

Even though the Court of Criminal Appeals pointed out this important fact, the defendant apparently still fails or refuses to recognize that he was in fact a convicted criminal when the trial court allowed the prosecution to obtain his fingerprint in the presence of the jury. The jury had already convicted the defendant of first degree premeditated murder. This fact is significant because it distinguishes this case from the cases upon which the defendant relies. For example, the defendant in Estelle was forced to stand *trial* in prison garb. 425 U.S. at 502-03. In Braden, the trial court informed the *trial* jury that the defendant was in custody. 874 S.W.2d at 625-26. By contrast, in this case the jury already had convicted the defendant of first degree murder; thus, he was no longer entitled to the presumption of innocence when he was required to submit to fingerprinting. Therefore, the defendant's reliance upon Estelle and Braden is misplaced.

The defendant also contends that, despite his refusal to stipulate to the prior convictions, fingerprinting was unnecessary because he did not contest his identity as the person convicted of the four prior felonies. We disagree. The prosecution had the burden of proving the (i)(2) aggravating circumstance beyond a reasonable doubt. This burden includes the burden of proving the defendant's identity as the person convicted in 1997 of robbery, kidnapping, attempted rape, and reckless endangerment. State v. Dellinger, 79 S.W.3d 458, 472-73 (Tenn. 2002). Although a certified copy of a judgment of conviction creates a permissive inference of identity, the prosecution cannot be faulted for introducing additional evidence to establish identification. See id. at 472. Moreover, as this Court recently recognized, the prosecution's right to prove its case may not be foreclosed by a defendant's characterization of the proof as undisputed or by a defendant's offer to stipulate or concede certain factual issues. State v. Robinson, 146 S.W.3d 469, 491 (Tenn. 2004). Thus, a defendant's failure to contest an issue or a defendant's offer to enter into a stipulation does not preclude the prosecution from introducing relevant, admissible evidence to prove its case.

Furthermore, requiring the defendant to submit to fingerprinting in the presence of the jury did not violate the defendant's constitutional rights. The Fifth Amendment privilege against self-incrimination protects an accused "from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. . . ." Schmerber v. California, 384 U.S. 757, 761 (1966). The privilege against self-incrimination

> offers no protection against compulsion *to submit to fingerprinting*, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.

Id. at 764 (emphasis added); see also State v. Walton, 41 S.W.3d 75, 87 (Tenn. 2001) ("[T]he Fifth amendment applies only to testimonial or communicative evidence."). The presence of the jury does not enlarge the scope of the privilege against self-incrimination so that a defendant may not be required to provide fingerprints. Indeed, courts have concluded that requiring a defendant to provide fingerprints in the presence of the jury does not violate the Fifth Amendment privilege against self incrimination. See Timothy E. Travers, Annotation, Propriety of Requiring a Criminal Defendant to Exhibit Self, or Perform Physical Act, or Participate in Demonstration, During Trial and in Presence of Jury, 3 A.L.R.4th 374, § 13 (1981) (citing cases).

Also without merit is the defendant's assertion that fingerprinting in the presence of the jury violated his constitutional right to a fair trial. Some courts have concluded that a defendant's constitutional right to a fair trial may be infringed if the defendant is required in the jury's presence to participate in performances or demonstrations that damage the defendant's image or unjustly humiliate or degrade the defendant. See United States v. Doremus, 414 F.2d 252, 253-54 (6th Cir. 1969) (per curiam). However, we are unaware of any authority supporting the proposition that fingerprinting is an humiliating, degrading, or damaging demonstration that gives rise to a Fourteenth Amendment violation. As the Court of Criminal Appeals succinctly explained in this case:

> Fingerprinting, unlike being handcuffed or wearing an inmate's uniform, does not portray the defendant as a dangerous criminal. As noted by this court over twenty years ago, fingerprinting is a commonplace practice which "signifies neither criminality nor saintly living." State v. Tyson, 603 S.W.2d 748, 753-54 (Tenn. Crim. App. 1980).

Like the Court of Criminal Appeals, we are not persuaded that requiring the defendant to be fingerprinted in the presence of the jury deprived the defendant of a fair trial. This issue is without merit.

## IV. AGGRAVATING CIRCUMSTANCE (i)(2)

The defendant's death sentence is based upon aggravating circumstance (i)(2), which applies when "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2) (1999). To establish this aggravating circumstance, the prosecution presented evidence that the defendant had been convicted in 1997 of robbery, kidnapping, attempted rape, and reckless endangerment.[4] "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Kidnapping is false imprisonment of the victim under circumstances which expose the victim to a substantial risk of bodily injury. Tenn. Code Ann. § 39-13-303(a)(1). Felony reckless endangerment is committed

---

[4]The defendant pleaded guilty to these offenses. He originally had been indicted for aggravated robbery, especially aggravated kidnapping, reckless endangerment, and aggravated rape, and the indictment alleged that a firearm had been used in the offenses.

when one recklessly, through the use of a deadly weapon, engages in conduct which places or may place another person in imminent danger of death or serious bodily injury through the use of a deadly weapon. Tenn. Code Ann. § 39-13-103. Attempted rape is the attempted unlawful sexual penetration of a victim accompanied by force or coercion. Tenn. Code Ann. §§ 39-12-101(a)(3), 39-13-503(a)(1). "Force" involves "compulsion by the use of physical power or violence." Tenn. Code Ann. § 39-11-106(a)(12). The trial court concluded that the statutory elements of each of these offenses may or may not involve the use of violence, depending upon the facts underlying the conviction. However, after hearing the testimony of Darrell Webster, the victim of these crimes, the trial court instructed the jury that the crimes of robbery, kidnapping, reckless endangerment and attempted rape "are felonies, the statutory elements of which do involve use of violence to the person."

The defendant maintains that by instructing the jury that the statutory elements of these felonies involve the use of violence to the person, the trial court violated the Fifth and Sixth Amendments to the United States Constitution. Relying upon Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002), the defendant maintains that when the prosecution is relying upon the (i)(2) aggravating circumstance to support imposition of the death penalty, the United States Constitution mandates that the jury, not the judge, determine whether "the statutory elements" of the prior felony conviction "involve the use of violence to the person." The defendant concedes that the trial court followed the procedure enunciated by this Court in State v. Sims, 45 S.W.3d 1 (Tenn. 2001), and applied in more recent decisions of this Court. Nonetheless, the defendant maintains that the Sims procedure is not constitutionally sound in light of the United States Supreme Court decisions in Apprendi and Ring.[5] The State, in contrast, maintains that the trial court's jury instruction and the procedure enunciated by this Court in Sims do not violate Apprendi and Ring.

In addressing this claim, the Court of Criminal Appeals noted that, lacking a definitive decision by the United States Supreme Court, a "disparity of views exists as to whether the trial judge can decide issues involving an examination of the underlying facts of a prior conviction." Expressing doubt about the constitutionality of the Sims procedure, the Court of Criminal Appeals ventured to surmise:

> When a trial judge examines the underlying facts, factually determines that a prior offense involved violence, and then, based upon its finding of fact, instructs the jury as a matter of law that the prior felony involved violence, it is arguable that this usurps the role of the jury as trier of fact. Therefore, it is arguable the procedure outlined in Sims may well be in violation of Ring.

The intermediate appellate court did not rest its decision on this position but proceeded to conclude that, even if the trial court's instruction were error, it was harmless beyond a reasonable doubt

---

[5]The defendant raised this issue in the trial court and in the Court of Criminal Appeals.

because "any rational juror would have found that the prior felonies involved violence to the person."

We begin our analysis with <u>Sims</u>, in which this Court considered how trial courts should proceed when the prior felony convictions upon which the prosecution relies to establish the (i)(2) aggravating circumstance include alternative statutory elements that do not necessarily involve the use of violence to the person. In <u>Sims</u>, after carefully considering the language of the aggravating circumstance as well as the procedure utilized by the trial court, this Court held that in determining whether the statutory elements of a prior felony conviction involve the use of violence against the person, "the trial judge must necessarily examine the facts underlying the prior felony. . . ." 45 S.W.3d at 11-12. We explained that

> [t]o hold otherwise would yield an absurd result, the particular facts of this case being an ideal example. A plain reading of the statute indicates that the legislature intended to allow juries to consider a defendant's prior violent crimes in reaching a decision during the sentencing phase of a first degree murder trial. The underlying facts of Sims's prior felony convictions involve his shooting two people sitting in a car. To hold that these prior convictions do not involve use of violence against a person would be an absurd result contrary to the objectives of the criminal code. We cannot adhere to a result so clearly opposing legislative intent.

<u>Id.</u> at 12.

This Court has since reaffirmed the procedure developed in <u>Sims</u>. For example, in <u>State v. McKinney</u>, 74 S.W.3d 291, 305 (Tenn. 2002), we pointed out that, the "critical issue" for purposes of the (i)(2) aggravating circumstance is "whether the statutory elements of [the prior felony] involve the use of violence to the person *by definition*." (Emphasis added.) We reiterated that <u>Sims</u> provided the "appropriate analytical framework" for resolving this important issue. <u>Id.</u> at 306. In rejecting the defendant's challenge to the sufficiency of the evidence and in concluding that McKinney's prior conviction for aggravated robbery had been premised upon statutory elements that involve the use of violence to the person, this Court stated:

> Here, the defendant testified during sentencing that he did not participate in the aggravated robbery that served as the basis of the aggravating circumstance. The defendant admitted, however, that his co-defendant was armed with a weapon and that he waited in the getaway car while the co-defendant carried out the robbery. Moreover, as the State observes, the defendant pled guilty to an indictment alleging that he and his co-defendant "violently by the use of a deadly weapon" robbed the victim. This Court has frequently held that the entry of an informed and counseled guilty plea constitutes an admission of all of the facts and elements necessary to sustain a conviction and a waiver of any non-jurisdictional defects or constitutional irregularities.

<u>Id.</u> at 306 (citations omitted). The following summary of the <u>Sims</u> procedure from <u>State v. Powers</u>, 101 S.W.3d 383, 400-01 (Tenn. 2003), also provides guidance on the issue presented in this appeal:

In Sims, the State introduced evidence of two prior convictions for aggravated assault to establish the prior violent felony circumstance. We recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence. Accordingly, we approved a procedure in which the trial judge, outside the presence of the jury, *considers the underlying facts of the prior assaults to determine whether the elements of those offenses involved the use of violence to the person. If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of the prior offenses. The trial court then would instruct the jury that those convictions involved the use of violence to the person.*

Id. at 400-01 (emphasis added).

Having summarized Sims and its progeny, we turn to Apprendi and Ring. In Apprendi, the defendant had been convicted of second-degree unlawful possession of a firearm, an offense carrying a maximum penalty of ten years imprisonment. 530 U.S. at 469-70. On the prosecutor's motion, the sentencing judge found by a preponderance of the evidence that the crime had been committed "'with a purpose to intimidate . . . because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" Id. at 468-69 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-2000)). This judicial finding of racial motivation had the effect of doubling from ten years to twenty years the maximum sentence to which Apprendi was exposed. Id. at 469. The judge sentenced Apprendi to twelve years in prison, two years more than the maximum that would have applied but for the judicial finding of racial motivation. Apprendi challenged the constitutionality of his sentence, arguing that under the Due Process Clause of the Fourteenth Amendment and the notice and jury trial guarantees of the Sixth Amendment, he was entitled to have a jury determine on the basis of proof beyond a reasonable doubt whether his crime had been racially motivated. Id. at 471-72.

The United States Supreme Court concluded that Apprendi's constitutional challenge had merit. After commenting that its answer to the question presented had been "foreshadowed by [its] opinion in Jones v. United States, 526 U.S. 227 (1999),"[6] the Court in Apprendi held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Applying this rule, the Court struck down the challenged New Jersey procedure as "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." Id. at 497.

Two years later, in Ring, the Court applied Apprendi to the Arizona capital sentencing statutes. 536 U.S. at 588-89. The narrow question presented in Ring was "whether [an] aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." Id. at 597. The Court emphasized the

_____

[6]Apprendi, 530 U.S. at 476.

limited nature of the issue presented, noting that of the thirty-eight states with capital punishment, twenty-nine, including Tennessee, "commit sentencing decisions to juries." Id. at 608 n.6. Overruling its prior decision in Walton v. Arizona, 497 U.S. 639 (1990), the Court in Ring held that, because Arizona's enumerated aggravating factors operate as "'the functional equivalent of [] element[s] of a greater offense,'" the Sixth Amendment requires that they be found by a jury, rather than by a judge. Id. at 609 (quoting Apprendi, 530 U.S. at 494 n.19); see Holton, 126 S.W.3d at 863 (discussing the decision in Ring). Explaining its holding, the Court stated:

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.

536 U.S. at 609 (emphasis added). Thus, the holdings of Apprendi and Ring were succinctly described by the following language from Ring: "If a State makes an increase in a defendant's authorized punishment contingent on the *finding of a fact*, that *fact*--no matter how the State labels it--must be found by a jury beyond a reasonable doubt." Ring, 536 U.S. at 602 (emphasis added).

More recently, in Blakely v. Washington, 542 U.S. __, __, 124 S. Ct. 2531, 2536 (2004), the United States Supreme Court "appl[ied] the rule [] expressed in Apprendi." The petitioner in Blakely had been:

> sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with "deliberate cruelty." The facts supporting that finding were neither admitted by petitioner nor found by a jury. The State [of Washington] nevertheless contends that there was no Apprendi violation because the relevant "statutory maximum" is not 53 months, but the 10-year maximum for class B felonies in [Wash. Rev. Code Ann.] § 9A.20.021(1)(b). It observes that no exceptional sentence may exceed that limit. See [Wash. Rev. Code Ann.] § 9.94A.420. Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* See Ring, supra, at 602 ("'the maximum he would receive if punished according to the facts reflected in the jury verdict alone'" (quoting Apprendi, supra, at 483)); Harris v. United States, 536 U.S. 545, 563 (2002) (plurality opinion) (same); cf. Apprendi, supra, at 488 (facts admitted by the defendant). In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," [1 J.] Bishop, [Criminal Procedure] § 87, at 55, and the judge exceeds his proper authority.

Id. at __, 124 S. Ct. at 2537.

Clearly, Apprendi and its progeny preclude judges from finding "additional facts," id., that increase a defendant's sentence beyond the "statutory maximum," id., which is defined as the maximum sentence a judge may impose "*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Id. Equally as clear is that Apprendi and its progeny do not limit a judge's authority to make *legal* determinations that precede a jury's fact-finding and imposition of sentence.

The Sims procedure involves a legal determination, and as such this procedure does not transgress the dictates of Apprendi and its progeny. The (i)(2) aggravating circumstance requires only that the *statutory elements* of the prior felony involve the use of violence to the person. The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence. See Tenn. R. Evid. 104.

Furthermore, by making this legal determination, the trial court neither inflicts punishment nor usurps or infringes upon the jury's role as fact-finder. Once the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (i)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. The jury alone must decide these factual questions, and these are the factual questions that determine whether the maximum sentence of death will be imposed. Additionally, the facts underlying prior convictions are themselves facts that either were found by a jury's verdict of guilt or facts that were admitted by a plea of guilty.[7] Permitting the trial judge to examine such facts merely to determine which of the statutory elements formed the basis of the prior conviction does not violate Apprendi and its progeny.[8]

---

[7]The majority opinion in Apprendi recognized that Due Process and Sixth Amendment concerns are mitigated where a jury has previously found beyond a reasonable doubt the existence of the facts necessary to convict the defendant of the prior offense. See, e.g., Apprendi, 530 U.S. at 488. Likewise, in Jones, which "foreshadowed" Apprendi, the United States Supreme Court explained that "unlike virtually any other consideration used to enlarge the possible penalty for an offense . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." Jones, 526 U.S. at 249. We are aware that questions have arisen concerning the continuing validity of Almendarez-Torres v. United States, 523 U.S. 224 (1998), and the prior conviction exception to Apprendi. See Apprendi, 530 U.S. at 520-21 (Thomas, J., concurring); see also State v. Wheeler, 34 P.3d 799 (Wash. 2001) (discussing status of Almendarez-Torres). Until such time as the United States Supreme Court overrules Almendarez-Torres, this Court is bound to apply it when interpreting the federal constitution. Furthermore, in our view, the majority opinions in Apprendi and Jones correctly described the distinct nature of prior convictions.

[8]See Moody v. State, No. CR-96-0994, 2003 WL 1900599 (Ala. Crim. App. 2003); Duest v. State, 855 So. 2d 33, 48-49 (Fla. 2003); Belcher v. State, 851 So. 2d 678, 685 (Fla. 2003); State v. Williams, 97 S.W.3d 462, 474 (Mo. 2003); see also United States v. Kempis-Bonola, 287 F.3d 699, 703 (8th Cir. 2002) (concluding that a determination of whether a prior conviction is aggravated does not fall outside of the Apprendi exception); United States v. Campbell, 270 F.3d 702, 706-07 (8th Cir. 2001) (concluding that Apprendi does not require that the nature

-15-

The Court of Criminal Appeals's concerns about the constitutionality of the Sims procedure stemmed from its mistaken belief that the procedure requires trial judges to make factual findings as to whether a prior conviction involved violence. As earlier explained, this simply is not the case. Thus, we reject the defendant's assertion that the trial court violated the defendant's constitutional rights by instructing the jury that the statutory elements of the defendant's prior convictions involved violence to the person. Because this instruction was not erroneous, we need not consider whether error under Apprendi and its progeny is subject to harmless error analysis.

## V. MANDATORY REVIEW

Tennessee Code Annotated section 39-13-206(c)(1) (2003) requires appellate courts to review a sentence of death to determine whether the sentence was imposed in any arbitrary fashion; whether the evidence supports the jury's findings of statutory aggravating circumstances; whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### A. Arbitrariness

The defendant contends that his death sentence was arbitrarily imposed because the criminal conduct resulting in the prior conviction on which the death sentence is based occurred when he was fifteen years old. In a recent case, State v. Davis, 141 S.W.3d 600, 618 (Tenn. 2004), this Court rejected the argument that prior convictions based upon conduct that occurred when the defendant was a juvenile cannot support the (i)(2) aggravating circumstance. As explained in Davis, this issue is without merit.

### B. Sufficiency of the Evidence of Aggravating Circumstance (i)(2)

The defendant argues that the evidence does not support the jury's finding of the (i)(2) aggravating circumstance because the four offenses used to establish this aggravating circumstance, robbery, kidnapping, reckless endangerment, and attempted rape, are not "felonies whose statutory elements involve the use of violence to the person." The defendant argues that this aggravating circumstance requires that the statutory elements of the offense involve the use of violence in every instance without regard to the facts of the offense as committed. As a result, the defendant argues that an offense like robbery, that is not limited by definition to the use of violence to the person, see McKinney, 74 S.W.3d at 305, cannot support aggravating circumstance (i)(2). In essence, this assertion is a roundabout challenge to this Court's decision in Sims. By adopting a procedure in Sims that applies when a prior conviction offense includes statutory elements that do not necessarily involve violence to the person, this Court implicitly rejected the argument the defendant now raises. Here, after examining the statutory elements of the offenses, the trial court correctly concluded that the statutory elements of all four prior felonies may not necessarily involve the use of violence. The

---

of prior convictions used to increase a defendant's sentence beyond the statutory maximum be proved to a jury); United States v. Santiago, 268 F.3d 151, 154-57, (2d Cir. 2001) (stating that Apprendi allows a judge not only to find the mere fact of a previous conviction but also to find related issues as well). Contra State v. Ring, 65 P.3d 915, 939 (Ariz. 2003).

trial court then appropriately examined the facts underlying the defendant's four prior convictions and determined that the defendant's convictions were based upon the statutory elements which do involve the use of violence to the person. The Court of Criminal Appeals correctly affirmed the trial court's legal determination regarding the statutory elements of the prior offenses and correctly concluded that the evidence is sufficient to support the jury's finding of the (i)(2) aggravating circumstance. This issue is without merit.

### C. Weight of Aggravating Circumstances versus Mitigating Circumstances

The defendant contends that the evidence does not support the jury's finding that the single (i)(2) aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt. He argues that the relevant question is not one of criminal responsibility but rather one of moral culpability and that the criminal law's most extreme sanction should not be imposed based solely on an act committed by a young teenager. The defendant also points out that his prior felony convictions resulted from a single criminal episode. Under these circumstances, he says, aggravating circumstance (i)(2) is entitled to less weight than it normally would be given, and it thus does not outweigh the mitigating circumstances.

In determining whether the evidence supports the jury's finding, the proper standard is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. See State v. Berry, 141 S.W.3d 549, 570 (Tenn. 2004); State v. Carter, 114 S.W.3d 895, 908 (Tenn. 2003); State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997). Jurors in this case were aware that the defendant committed the prior convictions at age fifteen and that these prior felony convictions stemmed from a single criminal episode. Consistent with the statute, the prosecution offered testimony about the facts of these prior convictions. Tenn. Code Ann. § 39-13-204(c) ("In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction.") The victim of these prior crimes recounted how the defendant had held a gun directly behind his ear, in the same area the victim in this case had been shot, how the defendant had forced him to perform fellatio, how the defendant and his companion had discussed killing the victim and disposing of his body, and how the victim had narrowly escaped his lengthy five-hour ordeal. Consistent with the statute, the jury was instructed to consider this evidence in determining the weight of the (i)(2) aggravating circumstance. Tenn. Code Ann. § 39-13-204(c) ("Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.") Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence is sufficient to support the jury's determination that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt.

### D. Comparative Proportionality Review

Finally, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). A death sentence is disproportionate only if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death

penalty has been imposed. . . ." Bland, 958 S.W.2d at 665; see also Holton, 126 S.W.3d at 865-66. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Bland, 958 S.W.2d at 665. Thus, the duty of an appellate court is not to assure "that a sentence less than death was never imposed in a case with similar characteristics," but instead to "assure that no aberrant death sentence is affirmed." Id.

While there is no mathematical or scientific formula involved in comparing similar cases, this Court generally considers: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. See State v. Vann, 976 S.W.2d 93, 107 (Tenn. 1998) (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Moreover in conducting this review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Carruthers, 35 S.W.3d at 570 (citing Bland, 958 S.W.2d at 666).

The defendant contends that the death sentence in this case is disproportionate because the (i)(2) aggravator, the sole aggravating circumstance, is based wholly upon felonies committed while he was a juvenile. The defendant asserts that the death penalty has never been imposed and upheld when (i)(2) is the sole aggravating circumstance and when this aggravating circumstance is based solely upon criminal offenses committed when the defendant was a juvenile. The defendant's assertion, although correct, does not render his death penalty disproportionate. This case, taken as a whole, is not plainly lacking in circumstances consistent with the circumstances of similar cases in which the death penalty has been imposed. Bland, 958 S.W.2d at 665; see also Holton, 126 S.W.3d at 865-66.

Considering the record in this case in light of the relevant comparative factors, the proof shows that the twenty-year-old defendant directed the twenty-seven-year-old victim to drive to a secluded, overgrown area behind an apartment complex. The defendant left briefly to get drugs, but returned without the drugs, angry and upset at the victim because the victim had not repaid a fifteen-dollar debt. The defendant held a gun to the victim's head, while telling the victim to open his mouth. The victim assured the defendant that he would repay the debt and offered to include an additional one-hundred dollars to compensate the defendant for the delay. The defendant was not to be placated. The defendant, without provocation or justification, and with premeditation, shot the helpless, unarmed, retreating victim in the head. To ensure the victim's death, the defendant placed the gun less than one inch from the victim's head and shot him again. The defendant then stole the victim's car keys from the victim's body and escaped in the victim's car. After the murder, the defendant admitted that he had killed the victim because the victim owed him fifteen dollars and

because the victim failed to show him respect. However, the defendant lied to the victim's mother and to police officers, and he fled from the police and failed to turn himself in, despite making arrangements to do so. The aggravating circumstance was fully supported by evidence that the defendant had pleaded guilty in 1997 to robbery, kidnapping, attempted rape, and felony reckless endangerment, crimes he had committed during a single criminal episode in 1995, when he was fifteen years old. The victim of these crimes provided detailed testimony which clearly established the aggravating circumstance and the facts underlying the prior convictions, including how the defendant and his accomplice kidnapped the victim at gun point, how the defendant held a gun to the victim's head in Russian-Roulette style and pulled the trigger twice, how the defendant and his accomplice discussed methods of killing the victim and disposing of his body, how the defendant forced the victim to perform fellatio upon him, and how the five-hour criminal episode ended without the victim being killed because the victim fortuitously escaped at the airport.

Mitigation testimony established that the defendant had been reared in a loving, supportive, and stable family. The defendant had refused to obey family rules and had eventually left his parents' home. Both the defendant and his parents testified that the defendant loves his young daughter, who currently resides with the defendant's parents, and the defendant and his parents expressed remorse for the victim's murder.

Although no two capital cases and no two defendants are identical, the following cases and defendants share several similarities with this case and with this defendant. State v. Davis, 141 S.W.3d 600 (Tenn. 2004); State v. Berry, 141 S.W.3d 549 (Tenn. 2004) (co-defendants Davis and Berry shot victims and stole a car; aggravating circumstances (i)(2), (6), and (7) applied to impose the death penalty); State v. McKinney, 74 S.W.3d 291 (Tenn. 2002) (defendant shot unarmed victim in the back of the neck; aggravating circumstance (i)(2) applied to impose the death penalty); State v. Stout, 46 S.W.3d 689 (Tenn. 2001) (defendant shot female victim in the back of the head and stole her car; aggravating circumstances (i)(2), (6) and (7) applied to impose the death penalty); State v. Sims, 45 S.W.3d 1 (Tenn. 2001) (defendant shot burglary victim in the head; aggravating circumstances (i)(2), (5), (6) and (7) applied to impose the death penalty); State v. Henderson, 24 S.W.3d 307 (Tenn. 2000) (defendant shot deputy sheriff in the head; aggravating circumstances (i)(3), (6), (8) and (9) applied to impose the death penalty); State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (defendant shot unarmed, fleeing victim in the leg; aggravating circumstance (i)(5) applied to impose the death penalty); State v. Taylor, 774 S.W.2d 163 (Tenn. 1989) (defendant directed another person to shoot victim in the back of the head; aggravating circumstances (2) and (7) applied to impose the death penalty); State v. Wright, 756 S.W.2d 669 (Tenn. 1988) (defendant shot victim in the head and stole victim's car; aggravating circumstance (i)(7) applied to impose the death penalty); State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984) (defendant shot victim twice in the back of the head; aggravating circumstance (i)(2) applied to impose the death penalty).

Furthermore, as the Court of Criminal Appeals noted, several defendants have been sentenced to death based solely on aggravating circumstance (i)(2). See, e.g., State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002); State v. McKinney, 74 S.W.3d 291 (Tenn. 2002); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000); State v. Keough, 18 S.W.3d 175 (Tenn. 2000); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987). Moreover, similarly-situated defendants have been sentenced to death. See, e.g., State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998); State v. Van Tran, 864 S.W.2d 465 (Tenn.

1993).  Having  compared the circumstances of the present case with the circumstances of the cases cited above and others not herein detailed, we conclude that this case, taken as a whole, is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed.  Thus, the defendant's sentence of death is not disproportionate considering the circumstances of the crime and the defendant.

## VI.  <u>CONCLUSION</u>

We have considered the entire record in this case and find that the sentence of death was not imposed in an arbitrary fashion, that the sentence of death is not excessive or disproportionate, that the evidence supports the jury's finding of the statutory aggravating circumstance and the jury's finding that this aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt.  We also have considered all the defendant's assignments of error and conclude that none requires reversal.  With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Joe G. Riley, and joined by Presiding Judge Gary R. Wade and Judge Jerry L. Smith.  Relevant portions of that opinion are published hereafter as an appendix.  The defendant's conviction and sentence are affirmed.  The sentence of death shall be carried out as provided by law on the 9th day of June, 2005, unless otherwise ordered by this Court or other proper authority.  It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

FRANK F. DROWOTA III,
CHIEF JUSTICE