# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 10, 2012

## STATE OF TENNESSEE v. JAMES ERIC HURD

**Appeal from the Circuit Court for Madison County**
**No. 10-745     Roy B. Morgan, Jr., Judge**

---

**No. W2011-01232-CCA-R3-CD  - Filed June 28, 2012**

---

Following a jury trial, the defendant was convicted of two counts of aggravated sexual battery and was sentenced to twelve years' imprisonment for each count, to be run concurrently, with a fine of $25,000 for the first count and a fine of $15,000 for the second count.  On appeal, the defendant's sole issue is the contention that the evidence at trial was insufficient to support the verdict.  After a thorough review of the record, we conclude that the evidence is sufficient and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, J.J., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, James Eric Hurd.

Robert E. Cooper, Jr, Attorney General and Reporter; David H. Findley, Senior Counsel; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, James Eric Hurd, was indicted on two counts of aggravated sexual battery stemming from fondling his twelve-year-old daughter on two separate occasions.[1] After the victim confided in her peers and her peers told a school counselor, the defendant

---

[1]It is the policy of this Court to protect the identity of minor victims of sexual abuse.  In this opinion, we will refer to the victim as "the victim" and identify her family members through their relationships with her in order to protect her identity.

gave a statement in which he admitted having the victim remove her clothing but denied touching her.

At the defendant's jury trial on March 8, 2011, the State called Rachel Williamson, a crisis counselor for the Jackson-Madison County School System. Ms. Williamson testified that on Monday, April 26, 2010, a student at the victim's school alerted her to certain allegations of a sexual nature concerning the victim. Ms. Williamson sought out the victim for an interview, and after speaking with the victim, Ms. Williamson contacted DCS, the victim's mother, and the police, which she testified was her ethical, professional, and legal obligation.

The victim testified that around the day of her twelfth birthday on February 8, 2010, she went to visit her father, the defendant, at his house. Also present in the home was her younger brother; the victim testified she believed he was four years old at the time of trial. The victim testified that she was in the living room when her father called her into the bedroom and told her to take off her clothes. The victim testified that the door remained open when she went into the bedroom and that her little brother was in the living room. Because the victim did not want to remove her clothing, she tried to avoid complying by going to the bathroom. The victim testified that when she came out of the bathroom, the defendant again told her to take off her clothes; she did not do so. The victim was standing by the bed and the defendant was on the bed. The defendant told her to undress again. The victim testified that she then complied and completely undressed. The defendant then told her to lie down on the bed. He then touched her vagina and breasts, and as he did so, he told her, "Don't let boys touch here." She testified he touched her breasts for three to five minutes. She testified that he also looked closely at her vagina and touched her vaginal area for five minutes. She testified that the defendant told her that her mother had asked him to "have a sex talk" with her. The victim told two friends about the incident, but did not tell any adults.

On a Saturday in April of the same year, the victim accompanied the defendant to his auto painting business. The victim went with the defendant to the office, and the defendant told the victim to get undressed and lie on the table. The victim testified that defendant kissed her mouth and touched her breasts, buttocks, and vaginal area for a "long time." The victim testified that on the following Monday, she told Ms. Williamson what the defendant had done, and Ms. Williamson contacted the authorities. The victim testified that she wrote in her journal after the second assault but prior to telling Ms. Williamson. The victim identified a picture she drew representing pain. She also wrote:

> "My problem with my daddy:
> He touched me on my breast & on my pr[i]v[a]te area. He

tongued-kissed me & grabbed my butt I'm scared the next step is rape, but I'm scared to tell my mom because my dad could go to jail I'm scared this put me in a weird position. To tongue kiss your dad your dad is not supposed to do that I'm scared out of my mind LORD PLEASE HELP ME I NEED YOU I NEED YOU I need your help Lord

On cross-examination, the victim acknowledged that she had been disrespectful to her stepfather and her father had talked with her about being respectful towards her stepfather. She testified that her father did not speak with her on the way to the store. The victim testified that prior to the first assault, she had stayed with the defendant and her stepmother nearly every weekend; subsequent to the assault, the victim would make excuses and ask to stay at a friend's house on the weekend. She testified she did not visit the defendant between the first and second assault. She testified that she did not see her little brother during this time because she was afraid to go to her father's house. She acknowledged that she spent time on a college campus with her older brother but denied having a friend who was a fifteen-year-old boy or who brought food for her to school.

Danielle Jones, an investigator for the Jackson Police Department in the violent crimes unit, took a statement from the defendant on April 30, 2010. Officer Jones testified that she read the defendant his rights, made sure the defendant read the waiver for himself, and made sure he understood the document before he signed. She told him that there were allegations he had been inappropriately touching his daughter and that she was going to speak to him about those allegations. The defendant, who was worried and "nervous about what was going on," proceeded to give a statement:

> Over the weekend I had a conversation with [the victim] about anyone touching her. I talked to her about coming on her cycle and she didn't feel comfortable about it. I tried to ask her and make sure no one touched her or fondled her. I told her I was going to check and I asked her to take off her clothing so I could. She took her clothes [sic] and I checked her. She asked what fondling meant and I said touching and pointed at the areas (breast, vagina). She put her clothes on. I asked if she felt Daddy did anything wrong and she said no. I told her it was wrong for anyone, Mom, Dad, or anyone to touch her. We had this conversation. [The victim] is really friendly to people and I see stuff in the news about people doing things to kids and I was trying to protect and warn her about people.

The defendant's statement was admitted into evidence.

Doctor Lisa Piercey, a pediatrician and the director for the Madison County Child Advocacy Center, testified as an expert witness in the field of medicine concerning the maltreatment of children. Dr. Piercey testified that she took the victim's medical history, which she relied on for diagnosis and treatment; Dr. Piercey took the medical history without familiarizing herself with the allegations so that her questions would not be biased. Dr. Piercey testified that she told the victim the importance of providing accurate information for the medical history. Dr. Piercey recounted the victim's narrative, which was essentially the same as her testimony with the exception that Dr. Piercey testified that the victim did not say that the defendant touched her breasts. Dr. Piercey testified that she performed a physical examination, during which she did not expect to find any evidence because the crime the victim described "very rarely, if ever, leaves any physical evidence," and because the events had happened two and four months prior to the examination. Dr. Piercey testified that when conducting an examination on a child, she used a special tool called a colposcope which allowed specialized magnification. She testified that a lay person without specialized training or access to medical equipment would not be able to accurately diagnose allegations of sexual assault. Dr. Piercy testified that she found no physical evidence and no evidence that the victim was penetrated.

The defense called the victim's mother to testify. The victim's mother testified that she first heard about the victim's allegations on April 26, 2010. She testified that she had asked the defendant to speak with the victim about being disrespectful to her stepfather, and he had done so. She testified that the victim's older brother was in college and the victim would spend time with him and his friends on campus. The victim's mother contradicted the victim's testimony in that she asserted that the victim had visited the defendant's home at least two times between February 8 and April 24, 2010. She testified there was no set visitation schedule between the victim and the defendant. The victim's mother testified that she had never asked the defendant to have a conversation with the victim about the victim being involved with a fifteen-year-old boy.

Chantelle Hurd, the defendant's wife, confirmed the victim's testimony that she had not visited the defendant after February 8, 2010. She also confirmed that the defendant was alone with their son and the victim while Ms. Hurd was at work on Feruary 8, 2010. Ms. Hurd testified that there was no set visitation schedule between the defendant and the victim, but the victim generally came every other weekend. Ms. Hurd confirmed the victim's testimony that she was spending the weekends between February 8, 2010 and April 24, 2010 with her friends. According to Ms. Hurd, the victim "would call us and talk to us, but she was like, 'Well, I'm going over to my friend's house this weekend, so I'll come next weekend,' and then she'd call back and say she was going to a different friend's house."

The defendant testified on his own behalf at trial. He testified that on February 8, 2010, he was with his son and with the victim. According to the defendant, the victim's mother had asked him to speak with the victim about two topics: sex and acting disrespectfully to her stepfather. The defendant stated that the victim's mother mentioned there was a fifteen-year-old boy on the street that "might be trying to mess with her." The defendant testified that he asked the victim if she knew her private parts, if she was involved with any boys, and if anybody had touched her, and she responded no. He testified that she did not take off her clothes on February 8, 2010 and that he did not touch her on that date. The defendant testified that on April 24, 2010, after some discussion with the victim and her stepfather regarding getting the victim to him for a visit, he met the victim and her stepfather at a public place and picked her up in his truck. The defendant had not heard from the victim in a week or two, which was unusual because the victim usually texted or called him every other day. Based on a request from the victim's mother, the defendant had asked the victim how she felt about "coming on her cycle"; the victim's mother made this request because she felt the victim would listen to the defendant more than she would to her mother. The defendant took the victim to his shop because it was about to storm. The defendant testified that he did not touch her at all on April 24, 2010, but had "looked [her] over for bruises and scars." The defendant speculated that the victim said he touched her because "it might have embarrassed her by being a man and looking at her like that." The defendant testified that the victim visited him during the time she said she was making excuses to stay away.

On cross-examination, the defendant again denied touching the victim or having the victim remove her clothing on February 8, 2010. The defendant acknowledged that he had the victim remove her clothes on April 24, 2010 so that he could "check her." He testified he was looking for scars and bruises on her breasts and vaginal area because when he had asked her in the car if anyone had touched her, she paused before saying "no," and then she did not respond when he asked if she were sure. He testified that he believed his examination was appropriate. He testified that he decided to "check her" at the shop rather than his home because the shop was located close to the hospital where the victim's mother worked, and they could have gone there if he had found something. He acknowledged that he had no medical expertise.

In rebuttal, the State recalled the victim's mother, who testified she had never asked the defendant to have a talk with the victim about either sex or her menstrual cycle. The victim's mother testified that the college students that the victim met through her brother were female.

The jury found the defendant guilty of both counts of aggravated sexual battery, a Class B felony. The jury also imposed a $25,000 fine for the first count and a $15,000 fine for the second count. The defendant was sentenced as a Range I offender to twelve years'

imprisonment for each count, with the sentences to run concurrently. The defendant appeals the sufficiency of the evidence underlying his conviction.

**Analysis**

Under the Tennessee Rules of Appellate Procedure, a court must set aside a conviction "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The reviewing court does not determine if the evidence establishes guilt beyond a reasonable doubt; instead, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). The reviewing court may not re-weigh or re-evaluate the evidence, and may not substitute its own inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). The presumption of innocence that surrounded the defendant at trial is replaced by a presumption of guilt, and the defendant bears the burden of proving that the evidence is not sufficient to support his conviction. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

Aggravated sexual battery, in the circumstances of this case, is "unlawful sexual contact with a victim by the defendant" when the victim is less than thirteen years old. T.C.A. § 39-13-504. "Sexual contact" is the intentional touching of a person's intimate parts, defined as including "the primary genital area, groin, inner thigh, buttock or breast," "if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(2), (6).

The proof at trial, seen in the light most favorable to the State, showed that the defendant told the victim to undress and touched the victim's intimate parts on or near her twelfth birthday; that the victim avoided the defendant's home for a period of over two months thereafter; and that the defendant again made the victim undress and touched her intimate parts. The defendant's testimony was at odds with that of other witnesses, including that of the victim's mother, who testified that she did not ask the defendant to speak with the victim about sex or her menstrual cycle; that of the defendant's wife, who testified that the victim did not visit the defendant between the two incidents; and that of the victim. The defendant contends that his sworn testimony creates such doubt regarding his guilt that no rational trier of fact could have found the essential elements of the crime. However, if a

defendant's own testimony were always legally sufficient to establish that no rational trier of fact could have found him guilty beyond a reasonable doubt, few crimes would go punished. The jury was tasked with making credibility determinations and settling conflicts in testimony. "Questions concerning the credibility of witnesses . . . are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). We conclude there was no error.

## CONCLUSION

Based on the foregoing, we conclude that the evidence was sufficient to uphold the defendant's convictions and we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE