# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2012

## STATE OF TENNESSEE v. ANTHONY BENTON

**Appeal from the Criminal Court for Shelby County**
**No. 10-00853      Chris Craft, Judge**

---

**No. W2011-02671-CCA-R3-CD  - Filed December 13, 2012**

---

A jury convicted the defendant, Anthony Benton, of reckless endangerment, a Class E felony; aggravated assault, a Class C felony; and possessing a handgun after having been convicted of a felony, a Class C felony.  The reckless endangerment count was merged into the aggravated assault conviction.  The defendant received an effective sentence of nineteen years.  On appeal, the defendant asserts that the evidence at trial was insufficient to support the verdicts.  After a thorough review of the record, we affirm the judgment of the trial court, but remand for a corrected judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, District Public Defender; and Trent Hall (at trial) and Barry W. Kuhn (on appeal), Assistant District Public Defenders, for the appellant, Anthony Benton.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell and Alanda Dwyer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

The defendant's convictions are the result of the August 22, 2009 shooting of the victim, Jerry Bradley, after an argument between the parties regarding the defendant's dog. The defendant was indicted for attempted second degree murder,  aggravated assault,

employing a firearm during the commission of a dangerous felony, and possession of a firearm after having been convicted of a felony. The trial court decided that the count charging the defendant with being a felon in possession of a handgun should be tried separately from the other three counts in order to avoid prejudicing the jury with introduction of evidence of any of the defendant's prior convictions.

At trial, the victim testified that on August 22, 2009, he was visiting a friend named Roy Townsel, who lived in the neighborhood in which the victim had grown up. The victim drove to Mr. Townsel's home for a cookout and, later, told Mr. Townsel he was going to walk around the area to visit other friends.

At around 6:00 p.m., while it was still daylight, the victim walked to an adjacent street and stood on the sidewalk to speak with Emanuel Brooks, Orlandus Benton, and Calvin Brooks. The defendant was walking his pit bull and stood next to the victim to talk. The victim was acquainted with the defendant and knew him from the neighborhood as "Lil' Anthony." The victim testified that the dog was standing between himself and the defendant and that because the victim could hear the dog growling, he asked the defendant calmly and quietly if he could please move his dog. The victim testified that at that point the defendant "just went off" and "started to cussing." According to the victim, the defendant said that "[h]e was tired of folks telling him . . . what to do with his dog, and he was going to make a name for his self or something like that." The victim testified that he did not hit or threaten the defendant or his dog, that he had no weapon, and that the defendant was angry. The defendant then left.

The victim then moved to a neighboring yard, which had a wooden fence surrounding it. The fence had a gate across a driveway, and the gate had what the victim described as a "swag" or dip in it. Three or four minutes later, the victim saw the defendant come up to the fence and look over the fence. He testified that the defendant was five feet eight or nine inches tall, and that the fence was five to six feet tall. The defendant reached over the dip in the fence with a revolver, pointed it at the victim, and pulled the trigger twice. The gun clicked both times, and, unsurprisingly, the victim feared for his life. The defendant then ran away.

The victim started to return to Mr. Townsel's home to retrieve his car and go home. As he was turning to walk up Mr. Townsel's street, the defendant ran up behind him. The victim testified that the defendant said, "I'm not bullshitting with you." The victim testified he did not respond but kept walking straight and began to pray. The victim could not run because he had a bad hip, but he walked fast. He heard three shots fired and felt a sting and saw he had been shot in the legs. About six or seven minutes had elapsed since the defendant had "clicked" the gun at him over the fence. The victim testified he did not turn to look at

the defendant and did not see him but recognized his voice. The victim saw the defendant run away across a field, but could not describe his clothing. The victim testified he continued to walk to Mr. Townsel's home and waited there until the paramedics arrived. He testified that the bullet had gone through one leg and lodged in the other, where it remained, as it was not extracted by medical personnel. The victim had no permanent pain or difficulty walking. The victim testified that there had not been any alcohol at the cookout at the time he left. However, he did testify he had had two twenty-four ounce beers at approximately 3:00 or 4:00 p.m.

The victim identified the defendant from a lineup on September 7, 2009. The victim testified that he made the identification and gave the statement at the time he did because that was when the police asked him to come to the station. He testified that he also spoke to the police at the hospital. He testified that it did not take him long to make the identification and that, although Sanford Swayzer rode to the station with him, he was alone when he made the identification.

The State's next witness, Calvin Brooks, testified he grew up in the neighborhood with the victim. The defendant lived behind Mr. Brooks at the time of the shooting. Mr. Brooks testified that on August 22, 2009, he was sitting by the sidewalk near his home about fifteen yards away from the defendant and the victim, and he heard them arguing about the dog and whether the defendant had control of the dog. Mr. Brooks testified that the defendant left and headed towards a shortcut to the defendant's house. Mr. Brooks was also present on the same sidewalk when the defendant returned. He testified that the defendant came up to the fence and "he had a weapon in his hand and he couldn't get over the fence so he just held it over the fence and clicked the gun twice. I think it was two times, but it wasn't no bullets in it at that time." The victim was inside the fence, but Mr. Brooks could not see him. The defendant left, again going towards the shortcut. Mr. Brooks stated that afterwards, he tried to get the victim to leave because the defendant had said that he was going to do something to the victim. The defendant returned a third time, coming out of the shortcut, and asked which way the victim had gone. Another man in Mr. Brooks's yard told him where the victim had gone. Mr. Brooks heard three shots. He went to the corner and saw the victim walking. Not realizing that the victim had been shot, Mr. Brooks returned to his house.

On cross-examination, Mr. Brooks stated he had had two twenty-four ounce beers that day. He confirmed he heard the victim and defendant arguing about the dog, that there was no fighting, and that the defendant did not sic the dog on anybody. He stated he did not call the police when the defendant returned after clicking the gun because he didn't know what the defendant planned to do with the gun and because it was "the[ir] argument." He did not volunteer the information to the police at the time because he did not see the actual shooting

and it was not his business. He denied avoiding the police because he was drunk. He testified that his brother, Emanuel Brooks, and Orlandus Benton also were in his yard during these events. He stated that at the time of trial, Emanuel Brooks had just gotten off life support and "his mind is back like in 2005." He testified that he knew the defendant from having seen him around the neighborhood over the course of a year or two.

Sanford Swayzer, a friend of the victim, testified he had known the defendant from around the neighborhood for three or four years. He testified that he and the victim had gone to Roy Townsel's home for a barbeque, and that the three decided to go to another barbeque in the neighborhood. The victim left first. About ten minutes later, Mr. Swayzer and Mr. Townsel were preparing to follow when he saw the victim come around the corner. Mr. Swayzer asked what was the matter and then saw the defendant come up behind the victim with a gun. He heard the defendant say something but could not hear what he said. The defendant was four or five feet from the victim when Mr. Swayzer saw the defendant shoot three times with a silver revolver. The defendant was aiming the gun down. The victim never turned his head but kept walking. Mr. Swayzer did not see the victim with any weapon. The defendant went across a field that led to his street, walking fast. The victim's friends called an ambulance. Mr. Swayzer picked the defendant from a photographic lineup as the shooter. He testified that he rode to the police station with the victim but that no one told him to pick the defendant.

On cross-examination, Mr. Swayzer confirmed there was no alcohol consumed at the barbeque. He testified that he did discuss the events with the victim between the time they happened and the time he picked the defendant out of a lineup and also prior to trial. He also testified that the defendant shot in the air three times as he ran through the field after he had shot the victim.

Roy Townsel testified that he was acquainted with the defendant because the defendant's father grew up around the corner from him and that the defendant lived in his neighborhood at the defendant's girlfriend's house. He also witnessed the shooting and corroborated Mr. Swayzer's testimony that the defendant approached the victim, said something to him, shot three times, and went across a vacant lot, firing three shots into the air. Mr. Townsel testified the defendant shot with a "snub-nose .38." He also testified that the victim was unarmed, did not throw any punches, and that he saw no injuries other than the gunshot wounds. Mr. Townsel called 911. Mr. Townsel testified there were also children playing in the street, and one little girl's mother was outside during the shooting. On cross-examination, Mr. Townsel testified that he had had "a beer or so," and Mr. Swayzer may have had a beer. He testified he had not discussed the events with the victim or anyone since they happened.

Quentin Smith, a firefighter and paramedic with the Memphis Fire Department, testified that he treated the victim for a gunshot wound that had entered and exited one calf and entered the other. He found no other injuries. The victim was in pain but calm. The victim reported he had been shot with a revolver. Mr. Smith did not see any weapon on or near the victim. He stated that the victim did not appear intoxicated and that he would have put it in his report if he had smelled alcohol on the victim. On cross-examination, Mr. Smith initially testified that he had concluded the same bullet had caused all of the injuries because the victim had reported only hearing one gunshot. However, after the prosecution on redirect examination questioned him regarding the fact that his report referred to a single wound and did not mention the victim hearing a single shot, Mr. Smith testified that if he had stated the victim only heard one shot, it was a mistake.

Jeffrey Garey, an officer with the Memphis Police Department, arrived after the victim had been removed in an ambulance and testified that he took photographs of the crime scene. He testified regarding blood at the scene in the street, on the victim's abandoned shoes, and on the victim's car. Officer Garey testified he looked for, but was unable to locate, any spent casings. He testified that a revolver has a closed cylinder and that a spent bullet casing would remain inside, so he would not expect to find casings if a revolver had been used.

Another officer with the Memphis Police Department, William Burdett, testified that he arrived at the scene at approximately 7:00 p.m. and observed the victim, who had blood on his hands and legs, leaning on a car. He stated that he had asked someone to bring the victim a chair because the victim had been shot in both calves. He stated the victim had no weapon on or near him. He stated that the victim told him that he and the defendant had gotten into an argument over a dog and shots were fired. Another bystander had stated it had been four shots. Officer Burdett sent other police cars to the defendant's address, but they did not find the defendant. Officer Burdett parked his car so that it was blocking the street in order to secure the scene. He testified he found no casings or weapons at the scene. Officer Burdett confirmed that if a revolver were used, no casings would be found. Officer Burdett testified that a revolver might click and not fire a bullet if it were totally empty, if there was something wrong with the ammunition, or if a spent shell was in it. He testified that the crime scene officers photographed the scene and the Felony Response Unit officers interviewed witnesses. Someone at the defendant's house gave the police the name Anthony Benson.

Detective Robert Blair of the Memphis Police Department Felony Assault Unit testified that he was assigned to the victim's case. He testified that on the day after the August 22 shooting, he attempted to contact a witness who did not return his call. He also attempted to contact the victim but was unable to do so through the telephone because there was no answer and no way to leave a message. Two days later, he alerted local patrol

officers to search for the defendant. In the time between his initial attempts and September 6, Detective Blair did not attempt to contact witnesses due to his caseload. On September 6, he again attempted to contact the victim and a witness, and the following day, Detective Blair asked a patrol officer to try to make face-to-face contact with the victim. The victim called the office that day and agreed to give a statement. The victim gave a statement and reviewed and signed it, and then the victim picked the defendant out of a photographic lineup prepared by Detective Blair. Detective Blair also spoke with Mr. Swayzer, who also identified the defendant from a photographic lineup. Detective Blair testified he spoke with a female witness who did not give a statement. He also contacted Mr. Townsel. Detective Blair contacted the Investigative Services Unit to attempt to pick up the defendant, and they did. Detective Blair interviewed the defendant, who denied shooting the victim and denied being in the neighborhood.

Officer Curtis Allen of the Memphis Police Department was an investigator in the Investigative Support Unit at the time of the defendant's arrest. Detective Blair gave Officer Allen the defendant's name, and Officer Allen went to the address where the defendant lived with his girlfriend. The defendant was at home, was cooperative, and was taken into custody.

The State also introduced the victim's medical records. The defendant did not testify and offered no evidence at trial. After deliberating on the first three counts, the jury acquitted the defendant of attempted second degree murder but found him guilty of the lesser included offense of misdemeanor reckless endangerment in count one; found the defendant guilty of aggravated assault as charged in count two; and acquitted the defendant of employing a firearm during the commission of a statutorily defined dangerous felony in count three.

The same jury then heard the additional proof presented by the State as evidence in count four charging the defendant with possessing a handgun after having been convicted of a felony. Ross Herrin, the official keeper of the records for the criminal court, testified that the defendant had been assigned a records and identification number by the criminal court, and that his name and records and identification number also matched that for a prior conviction for aggravated assault in 2001, in which the defendant pled guilty to an assault with a deadly weapon, and prior convictions for aggravated robbery and attempted aggravated robbery in 2004, in which the defendant pled guilty to an indictment charging him with aggravated robbery and attempted aggravated robbery accomplished by violence or fear using a deadly weapon or article fashioned to reasonably appear to be a deadly weapon. The jury found the defendant guilty in count four of possession of a handgun after having been convicted of aggravated assault and aggravated robbery.

The trial court merged the conviction for reckless endangerment with the conviction

for aggravated assault and sentenced the defendant to serve thirteen years for the aggravated assault conviction. The court sentenced the defendant to serve six years for the felon in possession of a handgun conviction and ordered the sentences to be run consecutively for an effective sentence of nineteen years. The defendant challenged the sufficiency of the evidence supporting all three convictions in a motion for a new trial, and the trial court denied the motion.

**Analysis**

Tennessee Rule of Appellate Procedure 13(e) requires the reviewing court to set aside a defendant's conviction "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The appellate court determines "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's guilty verdict replaces the presumption of innocence with one of guilt, and the defendant bears the burden of showing that the evidence is insufficient. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of the evidence, and factual issues raised by the evidence are resolved by the trier of fact, and the appellate court does not reweigh or reevaluate the evidence or substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). Instead, on appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which may be drawn from the evidence. *Id.*

As charged in the indictment, aggravated assault is committed when a defendant intentionally or knowingly causes bodily injury to another and uses or displays a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(ii) (2006); T.C.A. § 39-13-101(a). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result" and knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(a), (b).

"A person commits an offense who possesses a firearm" and has a prior felony conviction for an offense "involving the use or attempted use of force, violence or a deadly weapon." T.C.A. § 39-17-1307(b)(1). "'Firearm' means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11).

At trial, numerous witnesses testified that they saw the defendant point a gun at the victim and pull the trigger. The victim testified that the defendant pointed a gun at him over a fence and pulled the trigger twice. Mr. Brooks also testified that after the argument over the dog, the defendant held a gun over the fence and "clicked" it while the victim was on the other side. The victim further testified that as he walked to Mr. Townsel's home, he heard the defendant speaking to him and that the defendant then shot him in the legs and ran away. Mr. Swayzer and Mr. Townsel likewise testified that they saw the defendant shoot the victim, and they further testified that he then fired three shots into the air as he left. All the eye witnesses recognized the defendant because they were acquainted with him as a neighbor. The victim and Mr. Swayzer identified him from a lineup. The testimony of the police officers and Mr. Smith regarding the physical evidence of the crime corroborated the testimony of the eye witnesses. Proof was introduced that the defendant had previously been convicted of aggravated assault and aggravated robbery, both felonies.

Taking the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that by aiming a gun at the victim and pulling the trigger, the defendant, by shooting the victim in the legs, intentionally or knowingly caused bodily injury to the victim by using a deadly weapon. Furthermore, a rational trier of fact could also have found that the defendant intentionally, knowingly, or recklessly possessed the weapon, a firearm, after having been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon. The evidence is sufficient to support the verdicts.

On review, we note that the judgment sheet documenting that the defendant was found guilty of possession of a firearm after having been convicted of a felony indicates that the defendant was sentenced as a persistent offender. However, the box indicating release eligibility has a checkmark next to multiple rather than persistent offender. We, therefore, remand in order to allow the trial court to correct the judgment sheet.

## CONCLUSION

Because we conclude that the evidence was sufficient to support the verdicts, we affirm the judgments of the trial court but remand for correction of the judgment sheet in accordance with this opinion.

_____
JOHN EVERETT WILLIAMS, JUDGE