# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 3, 2015 Session

## STATE OF TENNESSEE v. DETRICK COLE

**Appeal from the Criminal Court for Shelby County**
**No. 01-01221   Lee V. Coffee, Judge**

---

**No. W2013-02766-CCA-R3-CD  - Filed April 22, 2015**

---

A Shelby County jury found the Defendant, Detrick Cole, guilty of first degree premeditated murder and imposed a sentence of death.  The Defendant's conviction and sentence were affirmed by this Court, *State v. Detrick Cole*, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969 (Tenn. Crim. App., at Jackson, Nov. 24, 2003), and by our Supreme Court, *State v. Cole*, 155 S.W.3d 885 (Tenn. 2005).  The Defendant filed a petition for post-conviction relief alleging ineffective assistance of counsel, which was denied after a hearing.  On appeal, this Court agreed with the Defendant's contention that he had received the ineffective assistance of counsel during the penalty phase of his trial and remanded the case to the trial court for a new penalty phase proceeding.  *Detrick Cole v. State*, No. W2008-02681-CCA-R3-PC, 2011 WL 1090152, at *56 (Tenn. Crim. App., at Jackson, March 8, 2011), *perm. app. denied* (Tenn. July 14, 2011).  On remand and prior to the new penalty phase proceeding, the Defendant filed a motion challenging the State's introduction of his 1997 convictions in support of the prior violent felony aggravating circumstance, arguing that the violence of these convictions was ambiguous.  *See* T.C.A. § 39-13-204(i)(2).  The trial court denied the Defendant's motion, concluding that the issue had been previously litigated and decided in the Defendant's prior appeal.  The Defendant then filed an extraordinary appeal, pursuant to Tennessee Rule of Appellate Procedure 10, which this Court denied.  Thereafter, the Defendant agreed to accept a sentence of life without the possibility of parole, and a hearing was held to enter that sentence and a judgment of conviction reflecting that sentence. The Defendant appeals this judgment, contending that his sentence is illegal and void and should be set aside.  He again argues that he is ineligible to receive this sentence because his 1997 convictions were insufficient to support the prior violent felony aggravating circumstance.  After a thorough review of the record and applicable law, we dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Gene L. Humphreys, Jeffrey P. Yarboro, and Cecil W. VanDevender, Nashville, Tennessee, for the appellant, Detrick Cole.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; and Amy P. Weirich, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History

#### A. Trial and Penalty Proceeding

This case arises from the Defendant's killing of the victim, Santeife Thomas, by shooting him twice in the head. Based on this conduct, a Shelby County grand jury indicted the Defendant for first degree premeditated murder. Our Supreme Court summarized the underlying facts of the case as follows:

> [A]round 2 a.m. on October 17, 2000, the twenty-year-old [D]efendant, [], killed the victim, twenty-seven-year-old Santeife Thomas, by shooting him twice in the head. The evidence established that Thomas had returned home from work around 12:30 a.m. on October 17 and left shortly afterward in his late-model Mitsubishi Galant to visit a friend. Thomas was next seen at the Ridgemont Apartments in North Memphis, where he agreed to drive a person identified as "Little E" to the Raleigh Woods Apartments. The [D]efendant and fourteen-year-old Andropolis Wells accompanied [Thomas] and "Little E." Wells, testifying for the prosecution, related that after Thomas dropped off "Little E" at the Raleigh Woods Apartments, the [D]efendant asked Thomas to drive him to the Garden Walk Apartments. The [D]efendant directed Thomas to the back of the apartments and asked Thomas to park the car near an area overgrown with grass and weeds. After Thomas parked, all three men exited the car. Thomas and Wells waited near the car while the [D]efendant left to get crack cocaine from "Jerry." [FN2] The [D]efendant returned a short time later and said "Jerry" would bring them some drugs.

> > [FN2] According to Wells, the [D]efendant said he was going to get "some yams" from Jerry. Wells explained that "yams" is the street name for crack cocaine.

2

Wells waited at the car, but the [D]efendant and Thomas walked into the overgrown area. Wells heard the [D]efendant repeatedly telling Thomas to open his mouth and saw the [D]efendant pointing a gun at Thomas's face. Thomas, who had no weapon and made no aggressive move toward the [D]efendant, backed away and repeatedly told the [D]efendant to "stop playing." Wells then heard two gunshots. The [D]efendant ran from the bushes with a set of keys, but, apparently realizing that he had the wrong keys, the [D]efendant went back into the overgrown area and returned with another set of keys. The [D]efendant, who had blood on his hand, told Wells to get into the car. Shocked by the shooting and fearing for his own life, Wells accompanied the [D]efendant in the victim's car back to the Ridgemont Apartments. There, the [D]efendant removed two shells from the murder weapon, rubbed them with his shirt, and threw them into a garbage can. The [D]efendant and Wells then went to an upstairs apartment and left the gun with a person known to Wells as "Jewel."

When the [D]efendant and Wells returned to [Thomas's] car, the [D]efendant discovered that he had lost his electronic organizer during the killing and expressed fear that its discovery would lead to his apprehension. Thus, the [D]efendant and Wells drove [Thomas's] car back to the apartment complex to search for the organizer and parked in a driveway near the murder scene. They searched for a short time; the [D]efendant rolled [Thomas's] body over, but he did not find the organizer. When they returned to [Thomas's] car to leave, they noticed a man standing outside across the street looking at them. At the [D]efendant's instruction, Wells spoke briefly to the man before he and the [D]efendant left.

Wells remained with the [D]efendant for two days after the murder. Before the [D]efendant dropped off Wells at Wells's home, the [D]efendant told Wells that he had shot Thomas with a .44 caliber handgun because Thomas owed him fifteen dollars. Wells remarked, "Fifteen dollars? Man I could have gave you fifteen dollars." The [D]efendant replied, "N——r gonna start respecting me."

Wells's testimony was corroborated by the testimony of Marcus Puryear, who lived near the crime scene. At approximately 2 to 2:30 a.m. Puryear had been sitting in his car, talking on a ham radio when he heard "two loud gunshots-blasts." He saw a car speeding away from the direction of the gunshots, and from the sound of the car, Puryear identified the vehicle as having a small, four-cylinder engine. Later, while looking out the window of

3

his home, Puryear saw a car pull into a driveway immediately across from his residence. Two African-American males left the car and walked around into the area overgrown with weeds, near where the gunshots had sounded. After three or four minutes, the men returned to the car. By this time, Puryear was standing outside looking in their direction. One of the men walked over and asked if Puryear knew a person named Carlos or Michael who lived across the street. When Puryear answered that he had never heard of anyone by that name living there, the two men left. Puryear had not seen these men before and decided to write down the tag number, color, make, and model of the car they were driving. Puryear provided this information to the officers who discovered Thomas's body and investigated his murder. The description and tag number Puryear provided matched the description and tag number of the victim's vehicle.

On October 18, 2000, Robert Eric Adams, a resident of the Ridgemont Apartments, saw the [D]efendant sitting on the steps to Adams's apartment. Because the [D]efendant was looking "down," Adams asked him what was wrong. The [D]efendant said that he and his girlfriend had fought. During this conversation, the [D]efendant stunned Adams by telling Adams that he had killed Thomas. The [D]efendant said that Thomas had been taking him somewhere to get marijuana when the [D]efendant asked Thomas about money Thomas owed him. Thomas promised to pay the [D]efendant on Friday. After they arrived at their destination and left the car, the [D]efendant continued to ask Thomas about the debt. Thomas again said that he would pay the [D]efendant on Friday and offered to include an additional one hundred dollars for the delay. Believing that Thomas was lying, the [D]efendant took out a pistol and shot Thomas in the head and a second time in the face to assure that Thomas was dead. The [D]efendant told Adams that he had hidden Thomas's car. At the [D]efendant's request, Adams drove the [D]efendant to the Garden Walk Apartments, where the [D]efendant pointed to Thomas's body and said that he had dropped his "Rolodex" and was trying to find it. Searching the grass near the body, the [D]efendant found his organizer. The two men then returned to the Ridgemont Apartments. Adams testified that later that afternoon, Thomas's mother came to the apartments and asked if anyone had seen her son. The [D]efendant told her that Thomas might be "hanging out" or "partying." At some point thereafter, Adams told an acquaintance, Carlos Williams, that the [D]efendant had killed Thomas, but Adams did not tell Williams the location of Thomas's body.

On the evening of October 19, 2000, in an action unconnected with this

4

case, the police conducted a raid at the Ridgemont Apartments and arrested Carlos Williams for unlawful possession of a weapon. Williams, who apparently knew that Thomas's mother had filed a missing persons report, told the police what Adams had told him about the [D]efendant killing Thomas. On October 20, the police questioned Adams, who told them what the [D]efendant had said about the murder, except the location of Thomas's body.

Thereafter, the police arrested the [D]efendant as he was leaving a convenience store. At the time of his arrest, the [D]efendant had a Mitsubishi ignition key on his person. Arresting officers were unaware of the significance of the key and allowed the [D]efendant to retain it. By the time investigators first spoke with the [D]efendant at police headquarters, the key had disappeared. Officers later found it hidden under the cushion of the chair in which the [D]efendant had been sitting. The [D]efendant explained that he collected keys and had found the key at the Ridgemont Apartments. He denied knowing anything about Thomas's disappearance and claimed that he had hidden the key after having "second thoughts" about it. The police released the [D]efendant because at that time they had not found the victim's body and were not certain a homicide actually had occurred.

On October 21, the police discovered Thomas's body in a grassy, overgrown area in the Garden Walk Apartment complex. [Thomas] had no wallet, identification, keys, money or contraband on his body. On October 22, Thomas's automobile, which a patrol officer previously had noticed abandoned on a dead end street in North Memphis, was towed to police headquarters. The vehicle's license plates had been removed, and its VIN numbered covered. Blood was discovered on the handle of the driver's door. The ignition key police officers had seized from the [D]efendant fit [Thomas's] car. The [D]efendant's fingerprint was found on a piece of paper inside the car.

After obtaining additional information from Wells, the police resumed searching for the [D]efendant. On October 23 the [D]efendant called the police and set up a time to surrender, but he failed to show up at the agreed time. Finally, on October 25, eight days after the murder, patrol officers arrested the [D]efendant, who gave a statement. [FN3] Although the [D]efendant admitted he had killed Thomas, the [D]efendant claimed that he had shot Thomas because Thomas had charged him and threatened to hurt him. The [D]efendant said that Thomas had been four or five feet away when shot. The [D]efendant also claimed that he had needed the money Thomas owed him

5

to support himself and his pregnant girlfriend. Although the [D]efendant told the police that the gun they had taken from Carlos Williams was the gun he had used to shoot Thomas, tests revealed that it was not. The murder weapon was never found.

[FN3] After signing a waiver of his rights, the [D]efendant gave the following statement:

On the night that Teifus [Thomas] was murdered, it was me, Drop [Wells], and Teifus. We left the Ridgemont Terrace Apartments going to Garden Walk where Teifus told me that he had some money - some of the money that he owed me. And when we got there, he stalled - he stalled like telling me that he was waiting on the money but never did get it.

He told me that he gave me his key to his car as partial payment until he'd give me the money, but when I turned down the key, we got into an argument, and he went on about he wasn't going to pay me, and I asked him why, but he never did say. So he came in my face with threats that he wasn't going to pay me, and I could take it how I wanted to take it, and I asked him why he wasn't going to pay me, so that's when he went to putting his hands in my face and pushing me. And then we started into a small argument of words back and forth. And that's when he tried to attack me. I went into my pocket and pulled out a .38, and Teifus rushed at me, and I shot him.

After I shot him, I looked at his body and threw up. I still had his key in my left hand, and I got in his car, and I left the crime scene with Drop, and we went and parked the car, and we got out of the Ridgemont Terrace Apartments.

I went back to the body because I dropped my organizer, and I went to get it. And when I got it,

6

> I left and took his car and parked it again on Voltaire Street.
>
> The reason why I murdered Teifus really wasn't about the money. He charged at me as if he was trying to attack me and hurt me. Instead of me defending myself with my fist, I pulled the gun out, and I used it on him. I didn't have any place to stay. My girlfriend is pregnant, and we don't have any help, and I needed my money that he owed me. I just wanted to take care of my family and try to find a place for us to stay when the baby was born.

Dr. Craig Thomas Mallak, the forensic pathologist who had performed the autopsy on the victim's body, and Dr. Steven A. Symes, a forensic anthropologist who had reconstructed and examined the victim's skull, testified for the prosecution. Dr. Mallak explained that the victim had been shot twice in the head. According to Dr. Mallak and Dr. Symes, the victim was shot first above his left eye and next behind his left ear. Based on the damage to the victim's skull and brain, Dr. Mallak testified that both wounds could have been contact wounds, inflicted from extremely close range. Dr. Mallak opined that the wound behind the victim's ear definitely had been a contact wound, inflicted when the gun was less than one inch from the victim's head. Although Dr. Mallak was unable to determine conclusively whether the first wound also had been a contact wound, he opined that either wound would have been sufficient to cause the victim's death and to incapacitate the victim immediately. Dr. Mallak testified that the gunshots caused "complete destruction of the skull." Both Dr. Mallak and Dr. Symes opined that the wounds were consistent with injuries typical of a large caliber weapon such as a .44 caliber handgun.

*Cole*, 155 S.W.3d at 891-95. Based on this evidence, the jury found the Defendant guilty of first degree premeditated murder. At the subsequent sentencing hearing, the jury heard the following new evidence, summarized by our Supreme Court:

> [T]he Shelby County Criminal Court Clerk testified that the [D]efendant had pleaded guilty in February 1997 to robbery, kidnapping, reckless endangerment, and attempted rape and had received an effective sentence of three years confinement in the Shelby County workhouse. The

7

[D]efendant committed these offenses at age fifteen. In order to prove these four prior convictions, a fingerprint technician with the Shelby County Sheriff's Department obtained the [D]efendant's right thumb print in the presence of the jury, compared this print with the print associated with the booking number for the four prior convictions, and then testified that the [D]efendant's thumb print matched the print associated with the booking number for the four prior convictions.

All of the [D]efendant's prior convictions stemmed from a single criminal episode that occurred in 1995. Darrell Webster, the victim of the [D]efendant's prior criminal activity, testified for the prosecution. Webster recalled that during the early morning hours of November 18, 1995, as he was leaving an adult bookstore, the [D]efendant and another man accosted him at gunpoint and ordered him to get into [Webster's] car. After pleading with the two men, Webster thought he had convinced them not to harm him; however, eventually Webster came to believe the two men intended to kill him. The [D]efendant held a gun on Webster as the men drove around Memphis. The [D]efendant remarked to Webster, who was crying, "Do you want to go out like a punk? Go out like a man." After spinning the barrel of the gun, the [D]efendant placed the weapon against the back of Webster's head and pulled the trigger. The gun did not fire. Next, the [D]efendant placed the barrel of the gun against Webster's head, directly behind Webster's ear, and again pulled the trigger. Again the gun did not fire. Webster recalled the [D]efendant describing his actions as "Russian Roulette." Next, after accusing Webster of being a homosexual, the [D]efendant forced Webster to climb into the back seat and to perform oral sex on the [D]efendant. Thereafter, the [D]efendant and his accomplice discussed how to kill Webster and where to dump his body. By promising to rent a car for the two men, Webster finally convinced the [D]efendant's accomplice to drive to the Memphis airport. When the vehicle slowed to get a ticket for parking, Webster escaped and ran to a nearby airport security officer, who arrested the [D]efendant and his accomplice, thus ending Webster's five-hour ordeal.

The final witness for the State was victim-impact witness Marcie Turcios, the victim's half-sister. Turcios testified that the victim had been a very special, generous, giving person who helped others every way he could. She explained that his death had seriously affected both her and her brother's mother. Turcios explained that Thomas's death had left a void in her life, that she had missed work because she could not sleep, and that she regretted that her seven-year-old son would never have an opportunity to know his uncle.

8

The [D]efendant's father and mother testified in mitigation for the defense. The family had moved to Memphis from Ashland, Mississippi, about thirteen years earlier. In the ensuing thirteen-year period, the family had bought and sold five houses before returning to Olive Branch, Mississippi. The [D]efendant's grades began falling after the family came to Memphis. The [D]efendant's father had worked twelve to thirteen hours per day as the finance director for an automobile dealership. The [D]efendant's parents had been married for twenty-five years and described themselves as Christian people. The second of three children, the [D]efendant had regularly attended church with his family until he left home in 1996 because he refused to follow family rules. The [D]efendant was fifteen years old when he committed the offenses against Darrell Webster. The [D]efendant's parents confirmed that the [D]efendant loved his fourteen-month-old daughter, whom they were raising. The [D]efendant's mother and father pleaded with the jury to spare their son's life and expressed sorrow for the victim's death. The [D]efendant's father assured the jury that the [D]efendant was very sorry for what had happened.

The [D]efendant testified in his own behalf. Although he acknowledged killing the victim by shooting him twice in the head, the [D]efendant commented that "half of the things" the State's witnesses had said about the crime were lies. The [D]efendant expressed his remorse, maintained that he did not mean to do what he had done, acknowledged that he had done wrong and that he, not the victim, had been the "bad person," pleaded for mercy, and asked the jury not to kill him.

*Id.* at 895-96. After hearing the testimony, the jury found that the State had proven beyond a reasonable doubt first degree murder sentencing factor (i)(2), that the Defendant "was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." T.C.A. § 39-13-204(i)(2). The jury sentenced the Defendant to death. *Id.* at 896.

The Defendant appealed and this Court affirmed the Defendant's conviction for first degree murder and the jury's imposition of the sentence of death. *Cole*, 2003 WL 22848969, at *23. The Defendant appealed this Court's decision, and our Supreme Court docketed the case and requested oral argument on four issues, one being "whether . . . the jury rather than the judge must determine whether the statutory element of [the Defendant's] prior convictions used to support the [T.C.A. § 39-13-204](i)(2) aggravating circumstance involve the use of violence to the person." *Cole*, 155 S.W.3d at 891. Our Supreme Court affirmed this Court's decision and concluded that the evidence supported the jury's finding of the

9

statutory aggravating circumstance that the Defendant had prior violent felony convictions pursuant to T.C.A. § 39-13-204(i)(2). *Cole*, 155 S.W.3d at 909.

## B. Post-Conviction Proceeding

In 2007, the Defendant filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court denied his petition, and the Defendant appealed to this Court, raising multiple claims including that he had received the ineffective assistance of counsel during jury selection, the guilt phase, and the penalty phase of his trial. This Court concluded that the Defendant had received the effective assistance of counsel during jury selection and the guilt phase of his trial. We further concluded, however, that, during the penalty phase of the trial, trial counsel had failed to adequately investigate the Defendant's background and failed to present significant mitigating circumstances. *Cole*, 2011 WL 1090152, at *56. We concluded that, absent trial counsel's deficiencies, the outcome of the penalty proceeding might have been different. Thus, we reversed the Defendant's death sentence and remanded the case to the trial court for a new penalty proceeding. *Id.* We affirmed the post-conviction court's judgment with respect to the Defendant's claims concerning the guilt phase of his trial. *Id.*

On remand, the Defendant filed a "Motion to Strike" the State's notice of intention to seek the death penalty or life without the possibility of parole. In his motion, the Defendant again raised the issue of whether the prior violent felony aggravating circumstance, Tennessee Code Annotated section 39-13-204(i)(2), was an "appropriate" sentencing factor for his case, based on his 1997 convictions for robbery, kidnapping, attempted rape, and reckless endangerment. He contended that his prior convictions were ambiguous as to violence, because their "statutory elements did not necessarily involve the use of violence to the person," thus limiting the trial court's purview of the records and evidence supporting the aggravating circumstance. The Defendant further contended that, because he had entered best interest pleas to those convictions, he had not "admit[ted] to facts sufficient to allow the [trial court] to infer that [he] admitted using violence to commit the offenses." In the trial court's written order denying the Defendant's motion, it first noted that contained in the transcript from the plea submission hearing for the Defendant's 1997 convictions was the trial court's statement to the Defendant that he was entering pleas to convictions that involved violence. The trial court then stated that the issue of whether those convictions were sufficient to establish the aggravating circumstance had been previously litigated and ruled on by the Tennessee Supreme Court. The trial court declined to readdress the Defendant's argument and stated that there had been no changes in the law since our Supreme Court's ruling.

The Defendant subsequently filed an application to this Court for extraordinary review

pursuant to Tennessee Rule of Appellate Procedure 10. Holding that the issue raised by the Defendant did not "meet the strict criteria for review" pursuant to Rule 10, we denied the Defendant's application for extraordinary review.

Thereafter, pursuant to an "Agreed Order of Settlement," the Defendant agreed to be re-sentenced to life without the possibility of parole and a judgment was entered accordingly on October 28, 2013. The Defendant filed a timely notice of appeal of this judgment.

## II. Analysis

On appeal, the Defendant first argues that his sentence is illegal and void and should be set aside by this Court. Acknowledging that the sentence was imposed pursuant to a sentencing agreement, the Defendant argues that "none of the aggravating circumstances set forth in [T.C.A. § 39-13-204] exist[,]" and, thus, the trial court "lacked jurisdiction to impose the sentence." The State argues that this appeal should be dismissed because this Court lacks jurisdiction, as Tennessee Rule of Appellate Procedure 3(b) does not authorize an appeal as of right from an "agreed-upon sentence" with no reserved certified question of law. We agree with the State's contention that this case is not properly before us pursuant to Tennessee Rule of Appellate Procedure 3(b).

Tennessee Rule of Appellate Procedure 3(b) governs the circumstances in which a defendant in a criminal action has an appeal as of right. Rule 3(b) reads:

> In criminal actions an appeal as of right by a defendant lies from any judgment of conviction entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) on a plea of not guilty; and (2) on a plea of guilty or nolo contendere, if the defendant entered into a plea agreement but explicitly reserved the right to appeal a certified question of law dispositive of the case pursuant to and in compliance with the requirements of Rule 37(b)(2)(A) or (D) of the Tennessee Rules of Criminal Procedure, or if the defendant seeks review of the sentence and there was no plea agreement concerning the sentence, or if the issues presented for review were not waived as a matter of law by the plea of guilty or nolo contendere and if such issues are apparent from the record of the proceedings already had.

Tenn. R. App. P. 3(b). In other words, a defendant who has pleaded guilty may only present certain issues on direct appeal because he has a limited "appeal as of right" to the Court of Criminal Appeals. Tenn. R. App. P. 3(b); *see also* Tenn. R. Crim. P. 37(b)(2). The "limited" right of appeal exists in three circumstances:

First, a defendant has the right to appeal a sentence that was not the subject of the plea agreement; second, the defendant may have review of a certified question of law when a plea agreement has been accepted; and third, a defendant may seek review of issues that were not waived as a matter of law if the record clearly reflects an invalidating error. Tenn. R. Crim. P. 37(b)(2); Tenn. R. App. P. 3; *see State v. Wilson*, 31 S.W.3d 189, 192-93 (Tenn. 2000).

*State v. Yoreck*, 133 S.W.3d 606, 610-11 (Tenn. 2004).

In the present case, the Defendant appeals the trial court's imposition of his sentence of life without the possibility of parole. This sentence was imposed by an "Agreed Order of Settlement," signed by the Defendant, the trial court, and defense counsel. When the Defendant entered into this sentencing agreement, he did not reserve a certified question of law. Thus, because the Defendant was sentenced pursuant to an "Agreed Order of Settlement," a judgment not specifically included in Tennessee Rule of Appellate Procedure 3(b), he does not have a right of appeal before this Court. *See* Tenn. R. App. P. 3(b); *State v. McKissack*, 917 S.W.2d 714, 716 (Tenn. Crim. App. 1995) (holding that a defendant did not have a right to appeal his sentence pursuant to Rule 3 because he was "sentenced pursuant to the terms of a plea bargain agreement"); *State v. Christopher Martin*, No. E2012-00029-CCA-R3-CD, 2013 WL 709593, at *2 (Tenn. Crim. App. At Knoxville, Feb. 26, 2013) (citing *State v. Jay Bean*, No. M2009-02059-CCA-R3-CD, 2011 WL 917038, at *2 (Tenn. Crim. App. at Nashville, Mar. 16, 2011)), (stating that no right of appeal is available from an order not specifically listed in Rule 3(b)), *no Tenn. R. App. P. 11 filed*; *State v. Phillip G. Harris*, No. M2008-01819-CCA-R3-CD, 2010 WL 2431981, at *3 (Tenn. Crim. App., at Nashville, June 11, 2010), *no Tenn. R. App. P. 11 filed*. Accordingly, we must dismiss this appeal.

Assuming, *arguendo*, that the Defendant is entitled to an appeal, his contention that he is ineligible to receive the sentence of life without the possibility of parole is without merit. The Defendant's prior convictions for robbery, kidnapping, rape, and reckless endangerment involved the use of violence to the person. *Cole*, 115 S.W.3d at 905. This was established by the testimony during the original penalty hearing, and by the plea colloquy in 1997, wherein the State recited the facts surrounding the offenses, which included the Defendant twice placing a gun to the victim's head and pulling the trigger. At the guilty plea hearing for those convictions, the trial court advised the Defendant that he was being convicted of offenses involving violence and the Defendant acknowledged his understanding of this. The Defendant's 1997 convictions clearly established that violence to the person had been committed. Thus, the prior violent felony aggravating circumstance at Tennessee Code Annotated 39-13-204(i)(2) is an appropriate sentencing factor to support the Defendant's sentence of life without the possibility of parole.

### III. Conclusion

After a thorough review of the record and the applicable law, we dismiss this appeal.

_____

ROBERT W. WEDEMEYER, JUDGE