IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 07, 2015 Session


**STATE OF TENNESSEE v. EDWARD SAMPLE**


**Appeal from the Criminal Court for Shelby County**
**No. 1301735    W. Mark Ward, Judge**

_____


**No. W2014-01583-CCA-R3-CD  -  Filed October 21, 2015**

_____


The defendant, Edward Sample, was convicted of one count of aggravated robbery, a Class B felony, one count of attempted aggravated robbery, a Class C felony, and two counts of aggravated assault, Class C felonies.  On appeal, the defendant argues that the trial court erred in admitting evidence of his other crimes, that the trial court erred in failing to declare a mistrial, and that he was improperly fingerprinted during trial without counsel present.  Following our review of the briefs of the parties, the record, and the applicable law, we conclude that the trial court erred in admitting the evidence of other crimes, and we reverse the defendant's convictions and remand for a new trial.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; Case Remanded**

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J. and CAMILLE R. MCMULLEN, J., joined.

Terrell L. Tooten, Memphis, Tennessee, for the Appellant, Edward Sample.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Josh Corman, Assistant District Attorneys General, for the Appellee, State of Tennessee.


**OPINION**

# FACTS AND PROCEDURAL HISTORY

The defendant was charged in Case No. 13-01735 with one count of attempted aggravated robbery and one count of aggravated assault against Larry Miller and one count of aggravated robbery and one count of aggravated assault against Beonka Jackson. In Case No. 13-01736, the defendant was charged with carjacking of an unnamed victim, possession of a firearm during the commission of a dangerous felony, attempted second degree murder of Officer Josh Shearer, employment of a firearm with the intent to commit a felony, aggravated assault, intentional evading arrest in an automobile, and evading arrest. The State wished to consolidate the indictments, which the defendant opposed. Finding that the crimes were not part of a common scheme or plan, the trial court denied the State's motion to consolidate the indictments.

During the hearing on the motion to sever, the trial court also determined that the evidence in Case No. 13-01735 would be admissible in the defendant's trial for Case No. 13-01736 pursuant to Tennessee Rule of Evidence 404(b). After the ruling, the State chose to try the defendant for the crimes in Case No. 13-01735. The following proof was adduced at trial.

Larry Miller testified that on the evening of March 19, 2012, he had taken his girlfriend, Beonka Jackson, out on a date. In preparation for the date, Mr. Miller had thoroughly cleaned his black Yukon Denali SUV. After the date, Mr. Miller drove Ms. Jackson back to her mother's home. The two stopped at a stop sign at the intersection of Walnut and Scenic, several hundred yards away from her mother's house, and were discussing their relationship. Mr. Miller had the windows of his SUV rolled almost entirely down.

While the two were talking, the defendant "just came out of nowhere" "and hollered boo." The defendant stood on the running board of the SUV between the back and front driver's side windows, and both Mr. Miller and Ms. Jackson saw him pointing a small, black gun through the back driver's side window. Mr. Miller turned and saw that the defendant was wearing "a purple skull cap" and a grey jacket. Ms. Jackson also testified that the defendant was wearing a "purple skull cap." Mr. Miller noticed that the defendant's gun was "real small," and he believed that it was either a .22 or .380 caliber weapon. Mr. Miller knew the difference between semi-automatic guns and revolvers, and he stated that the defendant's gun was a semi-automatic.

Mr. Miller observed that the defendant had his hands on the window to steady himself, and he explained that it was impossible to stand on the running board of his SUV without holding anything for balance. The defendant was pulling on the back door handle in an attempt to enter the vehicle, and he broke the door handle. He then pointed

2

the gun at Mr. Miller through the front driver's side window of the SUV. The defendant demanded that Mr. Miller "give [him] everything you got" and continued to point the gun at him. The defendant threatened multiple times to shoot Mr. Miller in the face.

Ms. Jackson testified that she offered the defendant her purse, but he wanted money instead. Ms. Jackson informed him that she only had a $100 dollar bill, and she reached into her purse to retrieve the money. The defendant kept the gun pointed at Mr. Miller, who placed his hand in front of his face. The defendant told Mr. Miller, "[P]ut your hand down so I can shoot you in your face, b***h." He next trained the gun on Ms. Jackson, and Mr. Miller told him not to point the gun at her. The defendant aimed the weapon back at Mr. Miller and again threatened to shoot him in the face.

After Ms. Jackson gave the defendant her $100 dollar bill, Mr. Miller told the defendant that he had some cellular phones in the vehicle. Mr. Miller reached down to get the phones, and the defendant fired his weapon. Mr. Miller heard the gunshot and heard Ms. Jackson scream. Feeling something hot roll down his back, Mr. Miller believed that he had been shot. The object that rolled down his back was later determined to be a .380 shell casing, which was recovered from the driver's seat of his SUV.

Dazed, Mr. Miller opened his car door and exited the vehicle. He saw the defendant fleeing the scene, and he quickly got back into his vehicle to chase the defendant. While Mr. Miller drove, Ms. Jackson dialed 9-1-1. Mr. Miller saw the defendant in the middle of the street, and the defendant stopped and fired three more gunshots. Mr. Miller then ceased his pursuit and waited for police to arrive.

Neither Mr. Miller nor Ms. Jackson was able to make an out-of-court or in-court identification of the defendant. Ms. Jackson testified that she was shown a photographic lineup on the evening of the incident and agreed that she was unable to identify anyone from the lineup or narrow down her choice to a specific suspect. Both victims were shown the purple skull cap that the defendant was wearing when he was later arrested, and both said that the hat was similar to the one that they saw on the evening of the incident.

Eric Hutchison, a crime scene investigator with the Memphis Police Department ("MPD"), was dispatched to the scene. During his investigation, he discovered a .380 caliber bullet casing on the front driver's seat of Mr. Miller's vehicle. He also processed the rear driver's side door handle, the interior and exterior of the rear driver's side door and window, and the interior and exterior of the front driver's side window for fingerprints. Officer Hutchison was able to recover five prints from the vehicle and submitted the prints on five different cards to the latent print unit of the MPD.

3

Officer Larry Preston worked in the latent print unit, and he analyzed the fingerprints. Only one of the five cards, a sample from the interior of the rear driver's side window, had fingerprints of value, and those prints came from the left hand of the suspect. Officer Preston entered the fingerprints into the Automated Fingerprint Identification System ("AFIS") to compare them against a known database of fingerprints. He did not receive a match from AFIS, but the fingerprints were retained in "an unsolved latent file" database in the system. Several weeks later, AFIS alerted Officer Preston that there was a possible match for the fingerprints that he had submitted. Officer Preston analyzed the fingerprints and determined that they were an "identical" match for the defendant's fingerprints.

Debra Finley testified that she worked for the Shelby County Sheriff's Office in the Records and Identification Department. She explained that the office kept a record of the fingerprints of every individual arrested in Shelby County. She testified that she was asked to fingerprint the defendant on the morning of the trial, and she agreed that she was able to state to a degree of scientific certainty that his fingerprints matched the fingerprints on record in Sheriff's Office.

Officer Brian Beasley of the MPD testified that he was the case coordinator in an investigation of a carjacking that occurred on April 2, 2012. He stated that the car was recovered two days later and that the defendant was the prime suspect in the carjacking because the car was recovered after the defendant was chased by police, shot a police officer, and was arrested on the scene. Officer Beasley was later contacted by the Robbery Bureau because a .380 caliber handgun was recovered when the defendant was arrested and there was a .380 caliber shell casing recovered at the scene of the robbery. Officer Beasley explained that the Robbery Bureau also contacted him about the defendant because a fingerprint from the robbery was identified as belonging to the defendant.

On April 4, 2012, Officer Matthew Morton and his partner Officer Josh Shearer were responding to "a loose dog call." Officer Morton was driving the patrol car, and Officer Shearer was in the passenger's seat. A man flagged down the officers and explained that he had been carjacked earlier by an armed assailant. He told Officer Shearer that the person who carjacked him had recently driven by him, "stopped, pointed a gun at him[,] and said I thought I killed you already." He described the vehicle to the officers and told them that the suspect was in a nearby apartment complex. The officers later learned that the suspect was the defendant. They drove to the complex and saw someone who matched the description of the carjacker exiting the complex. The defendant made eye contact with the officers and gave them "like the I'm caught look." The defendant then sped out of the complex down James Road.

4

Angela Triplett testified that on April 4, 2012, she was driving on James Road. She saw a car speeding toward her coming from the opposite direction. She saw the car veer into her lane and drive onto a sidewalk. She saw the car, an Impala, wreck and a young man jump out of the car. The man started to run, and Ms. Triplett saw that he had a gun. She saw an officer start to chase the man, and she heard gunshots as the men ran into the woods.

After the defendant drove out of the complex, Officer Morton began to chase the defendant. He and Officer Shearer spotted the suspect's wrecked vehicle shortly thereafter "completely off the road," and the driver's side was completely engulfed in what appeared to be "thick woods." The wreck occurred near the intersection of James and Homewood. The officers saw the defendant running toward the woods. Officer Morton pulled his patrol car next to the wrecked vehicle, and Officer Shearer exited the patrol car to pursue the defendant on foot. Officer Shearer instructed the defendant to stop running and to lie on the ground, and the defendant ignored these commands and continued to flee. Running "full speed," Officer Shearer chased the defendant into a wooded area and was able to subdue the defendant. The defendant was lying face-down on the ground, and Officer Shearer was on top of the defendant attempting to place him in handcuffs. Officer Shearer ordered the defendant to give him his hands, and the defendant would not comply. At the time, the defendant's hands were in the waistband of his pants.

During the pursuit, Officer Shearer had drawn his service weapon, a .40 caliber Sig Saur pistol. Once he caught the defendant, he holstered his weapon and attempted to handcuff the defendant. The defendant rolled over onto his back, and Officer Shearer saw that he had a gun. The defendant fired one round that "grazed" Officer Shearer's shirt but did not pierce his skin. Officer Shearer grabbed his gun from his holster and fired a shot at the defendant. The shot did not subdue the defendant, and Officer Shearer was not sure if the shot even hit the defendant. The defendant fired a second shot that struck Officer Shearer directly in his chest. The men continued to fight, and Officer Shearer was able to wrest away the defendant's gun. The defendant attempted to take Officer Shearer's handgun from him several times during the struggle. Officer Shearer struck the defendant in the face and head with his handgun and fired a second shot at the defendant. After the second shot, the defendant "stopped resisting," and Officer Shearer was able to handcuff the defendant.

Officer Morton had followed Officer Shearer and the defendant on foot. When he reached the edge of the woods, he heard several gunshots. He ran into the woods and was calling Officer Shearer's name. He heard "just complete silence" until Officer Shearer alerted him a few moments later than he had been shot. When Officer Morton

5

reached Officer Shearer, Officer Shearer seemed to be "in shock," as "he was kind of pacing around with just that look on his face, but [Officer Morton] was taking stuff off trying to make sure he wasn't bleeding really bad or anything." Officer Shearer opened up his shirt and saw that he "had a lot of blood coming -- [he] touched [his] vest and there was blood on [his] hands." Officer Morton saw that the defendant was lying on the ground unconscious with a gun next to his person.

Officer Morton called for two ambulances to transport Officer Shearer and the defendant to the hospital. At the hospital, a bullet fragment from one of the bullets that the defendant shot Officer Shearer with was recovered when "it fell out of either [his] vest or [his] chest, one of the two." Officer Shearer testified that the bullet penetrated a weaker part of his bulletproof vest and struck him in the chest. He stated that the defendant shot him from "point blank range." Both Officer Morton and Officer Shearer identified the defendant in the courtroom as the person who shot Officer Shearer.

Officer Wayne Colson, a member of the MPD Crime Scene Unit, was one of the officers who responded to the scene. At the site of the shooting, Officer Colson found several items, including a black jacket, two spent .40 caliber Smith & Wesson shell casings, a spent bullet fragment, a Jimenez Arms .380 caliber pistol, and a spent .380 caliber shell casing.

Officers J.T. Rector and Sam Blue were also members of the MPD Crime Scene Unit. Officer Rector was sent to the hospital to collect clothes from Officer Shearer and the defendant. Among the items recovered from the defendant, Officer Rector took a purple skull cap. Additionally, Officer Rector collected two bullet fragments from Officer Shearer. Officer Blue recovered Officer Shearer's service weapon from the crime scene.

Eric Warren, a TBI Special Agent, testified as an expert in firearms identification. He explained that his methodology for working "a firearm and bullets and cartridge" case began by test firing the recovered weapon to obtain a known bullet and cartridge sample to compare against the casings and bullet fragments collected from the crime scenes. He then compared his test fires with the submitted evidence and examined the "class characteristics" and "individual characteristics" of the two samples. He explained that class characteristics were marks indicating a manufacturer's particular design or "blue print" for a firearm before it was made. He stated that examples of class characteristics included the shape and size of the firing pin of a weapon, along with "the direction, the twist of the rifling, and the lans and grooves." The "individual characteristics" were akin to "the mechanical fingerprint of the firearm." He explained that class characteristics allowed him to determine whether a particular type of firearm could have fired the

cartridge or bullet that he was examining and that individual characteristics allowed him to determine whether a specific gun fired the ammunition in question.

Agent Warren testified that he was able to test fire both Officer Shearer's .40 caliber Sig Sauer pistol and the defendant's .380 caliber Jimenez Arms pistol. He examined bullet fragments recovered from Officer Shearer, the two Sig Saur shell casings found at the shooting, the .380 caliber casing found at the shooting, and the .380 casing found in Mr. Miller's SUV. Agent Warren stated that he was able to conclude that the bullet fragment recovered from Officer Shearer at the hospital was fired from the defendant's Jimenez Arms pistol. He also concluded that the two Sig Saur shell casings were fired from Officer Shearer's gun. He was "unable to say scientifically" that the two .380 shell casings were fired from the exact same firearm found at the scene of Officer Shearer's shooting. He explained that the shell casings recovered from the crime scenes lacked a "mechanical fingerprint" and "did not have reproducible markings." He explained that the defendant's particular Jimenez Arms did "not leave reproducible or very good markings." He agreed that he could only say that the two .380 shell casings were "consistent" with having been fired by the Jimenez Arms pistol.

Agent Warren agreed that the Sig Sauer pistol was a higher-quality weapon than the Jimenez Arms pistol. He also agreed that the difference in quality of the firearms allowed him to identify conclusively the .40 caliber casings as a match for the Sig Sauer pistol but only to determine that the .380 shell casings were "consistent" with the Jimenez Arms pistol. He explained that this was "a very common scenario" for lower-grade firearms. He testified that due to the nature of the manufacturing process for lower-grade firearms, "the types of markings that can be left can be much shallower or non-existent even, and can result in not leaving reproducible individual characteristics that [he] can use to make [his] identification."

Agent Warren testified that he compared the two .380 shell casings to one another and to the casings from his test fires. He agreed that the shell casings recovered from each crime scene were consistent with one another and had the same markings and class characteristics. He stated that his test fires of the Jimenez Arms pistol "also exhibited the lack of characteristics" and "the lack of that [mechanical] fingerprint" present in the two recovered shell casings. He testified that the class characteristics of the shell casings from the crime scene and his test fires "were similar," meaning that it was "possible" that the Jimenez Arms pistol was "a type of firearm that could have fired that ammunition." He testified that he could not "say for certain" whether the two .380 cartridge casings were fired from the defendant's Jimenez Arms pistol. On cross-examination, he reiterated that "[i]t was possible" that a .380 caliber Jimenez Arms pistol fired the cartridge casings recovered at the crime scene.

7

Gary Cummings testified for the defense. He worked at the Memphis and Shelby County Juvenile Court where he oversaw the daily operation of the juvenile detention center. He explained that all juveniles charged with a felony were fingerprinted. He testified that there was a record indicating that the defendant was charged with a felony as a juvenile.

Albert Bonner testified that he was the lead investigator in Ms. Jackson's and Mr. Miller's case. He stated that he interviewed Ms. Jackson after the robbery. He testified that she told him that she believed that she could identify her assailant because he had something covering his face that slipped as he fled. He testified that in her statement, Ms. Jackson described her assailant as wearing "a gray jacket or a hoodie sweater and a purple skull cap on his head."

On April 13, 2012, Officer Bonner learned from the latent fingerprint technician that he received a positive match from the fingerprint taken from Mr. Miller's vehicle. He contacted Officer Beasley because Officer Beasley had the defendant in custody for carjacking charges. He testified that the scene of the robbery was "[a]pproximately a mile" from the scene where Officer Shearer was shot.

Shakendra Davis, the defendant's sister, testified that the James and Homewood and Walnut and Scenic neighborhoods were in the same area. She stated that the defendant lived in an apartment complex in that area at the time of the incidents and that the Walnut and Scenic Highway location was within walking distance of the complex. Ms. Davis testified that the area was not a "peaceful neighborhood," as shootings and home invasions frequently occurred. She agreed that it was not uncommon to hear gunshots and to find gun shells in the area. She testified that she had seen "[a] lot" of wool purple hats in the neighborhood and that it was not an uncommon type of hat. She stated that the defendant had been detained in juvenile court for "[b]reaking in a home," and she agreed that he was charged with a felony.

Keithia Carpenter testified that she knew the defendant through his brother. She explained that the Homewood and Walnut and Scenic Highway area was a "[b]ad" area. She testified that it was "very usual" to see people wearing a solid colored hat in the area and "[v]ery usual" to see people with solid colored purple hats. She testified that she had never seen the defendant wearing a purple hat.

Rachel Bowen testified as a rebuttal witness for the State. She worked for the Shelby County Sheriff's Department in the Criminal Records and Identification Unit. She testified that she did not have a record and identification of the defendant for a 2008 arrest. She explained that "once a person has entered the Shelby County Jail System, we

8

issue him a new R & I number and not a juvenile number." She testified that it would not surprise her that a juvenile record from an arrest in 2008 could not be found.

The jury convicted the defendant of the crimes as charged. The trial court sentenced the defendant to an eleven-year sentence for the aggravated robbery conviction, a five-year sentence for the attempted aggravated robbery conviction, and four-year sentences for the aggravated assault convictions. The court ordered partial consecutive sentencing for an effective sentence of sixteen years. The trial court denied the defendant's motion for new trial, and he filed a timely notice of appeal. We now proceed to consider his claims.

## ANALYSIS

The defendant argues that the trial court erred when it allowed the State to introduce evidence of crimes from a separate indictment at the defendant's trial. He also argues that the trial court erred in denying his request for a mistrial. Finally, he argues that the trial court erred in allowing the State to fingerprint the defendant without counsel present during the trial.

## I. 404(b)

The defendant argues that the trial court impermissibly allowed in evidence of other crimes committed by the defendant. Specifically, he contends that the probative value of the other crimes was outweighed by the danger of unfair prejudice and that the evidence was used for purposes other than establishing the defendant's identity. The State argues that the majority of the evidence was admissible but concedes that the trial court erred in allowing testimony regarding the shooting of Officer Shearer. The State contends that the error was harmless because of the overwhelming evidence of the defendant's guilt.

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as establishing the identity of the defendant. *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975); Tenn. R. Evid. 404(b) Advisory Comm'n Cmt. In order to admit evidence of a prior bad act:

(1) The court upon request must hold a hearing outside the jury's presence;

9

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

Ordinarily, this court reviews a trial court's evidentiary ruling regarding 404(b) under an abuse of discretion standard. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). However, if the trial court did not substantially comply with the procedural requirements of 404(b), our standard of review is de novo. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014).

The trial court conducted a jury-out hearing to analyze whether evidence from the instant case would be would be admissible in the defendant's trial for the carjacking case. The court found that the evidence in the case at bar was relevant for the non-propensity purpose of establishing the defendant's identity of the perpetrator of the crimes in the carjacking case. The court also found that there was clear and convincing proof that the defendant committed the crimes in the case at bar. The court did not weigh the probative value against the danger of unfair prejudice.

Prior to the testimony of Officers Morton and Shearer, the defense made a motion for a mistrial. During a hearing on the motion, the trial court also addressed whether the evidence of the crimes in the carjacking case would be admissible in the case at bar pursuant to Rule 404(b). The State wished to introduce evidence of the carjacking and shooting to link the gun, bullet, purple skull cap, and jacket of the defendant found at the scene to the crimes in the instant case to establish his identity as the perpetrator. The defense argued that the details of the crimes would be unfairly prejudicial and offered to stipulate that the gun, shell casings, and the items of clothing were found at a different scene involving the defendant in lieu of having officers testify about the carjacking and shooting. The trial court found that the defendant's identity was at issue. The court also found by clear and convincing evidence that the defendant had committed the shooting of Officer Shearer. The trial court did not weigh the probative value of the evidence against the danger of unfair prejudice or make a finding that the probative value was not outweighed the danger of unfair prejudice.

10

We conclude that the trial court did not substantially comply with the procedural requirements of 404(b) because it did not weigh the probative value of the evidence against the danger of unfair prejudice. Therefore, we review the admission of the evidence de novo without deference to the decision of the trial court.

Our review of the evidence leads us to conclude that the probative value was outweighed by the danger of unfair prejudice. The defendant's identity was a material issue at trial, making the evidence relevant for some purpose other than to prove propensity. However, only the testimony regarding the physical evidence and its recovery at the scene was probative of the defendant's identity. The detailed testimony regarding the nature of the other crimes did nothing to establish the defendant's identity as the perpetrator of the aggravated robbery, as neither Officer Morton, Officer Shearer, nor Ms. Triplett testified regarding the hat or jacket that the defendant was wearing or identified the firearm that he used. Instead, it was Officers Colson, Blue, and Rector who identified the items as belonging to the defendant that were common to both scenes, and the defense offered to stipulate that these items were found with the defendant.

Additionally, the physical evidence linking the two crime scenes was tenuous. The evidence from the second crime scene showed that the defendant was found with a purple skull cap, a black jacket, and a .380 Jimenez Arms pistol. The fact that Mr. Miller and Ms. Jackson were shown a purple skull cap that they identified as similar to the cap worn by their attacker was marginally probative of the defendant's identity. However, both Mr. Miller and Ms. Jackson testified that their assailant was wearing a gray jacket, and the jacket recovered at the scene of the second crime was black. Further, the State never provided the witnesses with an opportunity to identify the jacket recovered from the defendant. Finally, the ballistics evidence indicated that a .380 shell casing was recovered from the scene of the first crime and that a .380 Jimenez Arms pistol found on the defendant's person fired a bullet fragment removed from Officer Shearer's vest; Agent Warren could not testify that the casing from the first crime scene matched the casing from the second crime scene or that they were fired from the same gun. The testimony of Agent Warren established too broad of a link between the shell casings at the two crime scenes to be relevant to establishing the defendant's identity as the perpetrator of the crimes against Mr. Miller and Ms. Jackson. The prejudicial value of the evidence of the other crimes was substantial, especially in light of the fact that the victim was a police officer. Therefore, while the physical evidence from the second crime scene was admissible, we conclude that the testimony of Ms. Triplett, Officer Morton, Officer Shearer, and Agent Warren was inadmissible. Accordingly, the trial court erred in admitting this evidence.

This court reviews errors in evidentiary rulings under a harmless error standard. *Clark*, 452 S.W.3d at 287. The defendant bears the burden of establishing that the error

"more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). This court must consider the record as a whole in analyzing the effect of the error. *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

We conclude that the admission of the evidence of the other crimes was not harmless. The State devoted nearly half of its opening statement to a discussion of the other crimes. Both Officer Morton and Officer Shearer testified extensively about the factual circumstances of the crime. Their testimony established the defendant as the perpetrator of the shooting but had little to do with establishing the defendant's identity as the perpetrator of the aggravated robbery and aggravated assault of Mr. Miller and Ms. Jackson. The majority of the evidence linking the two crimes came from the testimony of officers who collected the bullets, shell casings, and the defendant's clothing, and from Agent Warren's testimony. Unlike other cases in which a second crime involving the use or possession of a firearm was admissible to establish the defendant's identity, there was no direct evidence linking the casings from the two crime scenes. *See State v. Howell*, 868 S.W.2d 238, 245-46, 254-55 (Tenn. 1993) (admitting evidence of other crimes when ballistics evidence confirmed that multiple bullets from different crime scenes were fired from the same gun); *State v. Taylor*, 669 S.W.2d 694, 697-98 (Tenn. Crim. App. 1983) (same). Here, the evidence was inconclusive, as Agent Warren testified that he could not scientifically conclude that the cartridges recovered from the scenes were fired from the same gun. Further, while fingerprint evidence carries a great deal of weight, neither Mr. Miller nor Ms. Jackson was able to make an in-court or out-of-court identification of the defendant. The evidence may have been sufficient to sustain the defendant's convictions, but the admission of the evidence of the defendant's other crimes "freed the jury to conclude more comfortably" that the defendant committed the crimes against Mr. Miller and Ms. Jackson. *Rodriguez*, 254 S.W.3d at 377. Therefore, we conclude that the evidence more probably than not affected the verdict in this case, and we reverse the judgments of conviction and remand the case for a new trial.

## II. Mistrial

The defendant argues that the trial court erred in denying his motion for a mistrial after Agent Warren testified. It appears that the defendant contends that the State misrepresented evidence to the trial court, including the substance of Agent Warren's testimony, that the trial court then relied upon to admit the evidence of his other crimes, making it an error for the trial court to admit the evidence.

12

In a jury-out hearing prior to trial, the State offered a summary of the ballistics evidence. The State informed the trial court that "the shell casings from both separate places have been determined to match each other." The State explained that the shell casings had similar markings but lacked sufficient distinct characteristics to conclude that they were fired from the same gun. The State also mentioned that both Mr. Miller and Ms. Jackson described their attacker as wearing a purple skull cap and a black jacket. At trial, both Mr. Miller and Ms. Jackson testified that their attacker was wearing a gray jacket. Agent Warren did not explicitly say that the shell casings from the two crime scenes "matched," as the casings lacked a "mechanical fingerprint." However, he agreed that the casings had similar markings and class characteristics both to each other and to the casings collected from his test fire of the Jimenez .380 caliber pistol. On cross-examination, Agent Warren testified that it was "possible" that the same type of gun as the defendant's pistol fired the two shell casings.

At the conclusion of Agent Warren's testimony, the defense moved for a mistrial. The defense argued that the State misrepresented the strength of the ballistics evidence to the court by stating that the casings matched. Trial counsel cited to Agent Warren's testimony that it was only possible that a Jimenez Arms pistol fired the casings to argue that Agent Warren could not even exclude other guns as having fired the shell casings. Trial counsel argued that Agent Warren's testimony, when coupled with the State's references to the shooting of Officer Shearer in voir dire and opening statements, made a mistrial necessary. The trial court denied the motion, finding that, although Agent Warren's testimony was not as "definitive" as the court expected, the testimony was open to interpretation and appropriately before the jury.

As the State points out, the defendant cites to no legal authority to support his argument. Therefore, this issue is technically waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The defendant is not entitled to any relief.

### III. Fingerprinting During Trial

The defendant contends that the trial court erred in allowing him to be fingerprinted during trial without counsel present. Specifically, he argues that under due process, trial counsel had a right to be present and to be informed that the fingerprinting procedure would take place.

On the morning of the defendant's trial, the prosecutor asked Ms. Finley to fingerprint the defendant. She did so, and she testified that the fingerprint matched his fingerprint included in his records and identification file. Trial counsel objected, arguing

13

that the procedure was conducted without his knowledge or presence and that he could not verify the chain of custody of the fingerprints. He also argued that the procedure violated the defendant's right to "due process and fundamental fairness." The trial court noted that fingerprints were "nontestimonial evidence" and "not controlled by the Fifth Amendment." The court further noted that had trial counsel been present and objected, the court would have overruled the objection. The court remarked that the fingerprinting occurred outside the presence of the jury. In regards to trial counsel's ability to be present at the fingerprinting, the court observed that the fingerprinting was not "a chain of custody kind of situation."

The defendant, conceding that the State had a right to fingerprint him while he was in custody, cites to no authority supporting his proposition that his right to due process was violated by the fingerprinting procedure. Fingerprints are not testimonial or communicative in nature, and courts have long recognized that the Fifth Amendment protection against self-incrimination does not extend to the taking of fingerprints. *Schmerber v. California*, 384 U.S. 757, 764 (1966); *State v. Cole*, 155 S.W.3d 885, 899 (Tenn. 2005). Our supreme court has also concluded that fingerprinting a defendant in the presence of the jury does not violate his right to a fair trial. *Cole*, 155 S.W.3d at 899. Therefore, we conclude that the taking of the defendant's fingerprints did not infringe upon his right to due process. The defendant is not entitled to relief as to this issue.

## CONCLUSION

Based upon the foregoing, we conclude that the trial court improperly admitted evidence of the defendant's other crimes. Accordingly, we reverse the defendant's convictions for aggravated robbery and aggravated assault and remand the case for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE

14